[Cite as *State v. Williams*, 2018-Ohio-974.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 16AP-350 |
| v. | : | (C.P.C. No. 16CR-0072) |
| Lorenzo D. Williams, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 15, 2018

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Michael P. Walton,* for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Yavitch & Palmer, Co., L.P.A.,* and *Jeffery A. Linn, II,* for appellant. **Argued:** *Jeffery A. Linn, II.*

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} After a bench trial in the Franklin County Court of Common Pleas, defendant-appellant, Lorenzo D. Williams, was convicted on two counts of robbery under R.C. 2911.02. Williams now appeals asserting errors in the admission of evidence and the trial court's failure to separate witnesses, as well as the legal insufficiency and manifest weight of the evidence used to convict him. For the reasons that follow, we affirm.

## I. FACTS & PROCEDURAL BACKGROUND

{¶ 2} On January 7, 2016, Williams was indicted on one second-degree felony count of robbery and one third-degree felony count of robbery under R.C. 2911.02. The second-degree felony count alleged that Williams did "inflict, attempt to inflict, or threaten to inflict physical harm" on the victim, Howard C. Boquist, Jr. ("Boquist"), while attempting to commit or while committing theft. (Jan. 7, 2016 Indictment.) The third-

degree felony count alleged that Williams did "use or threaten the immediate use of force" while attempting to commit or while committing theft against the victim. (Indictment.)

{¶ 3} Williams waived his right to a jury trial and represented himself before the trial court at a bench trial that began on March 28, 2016. (Tr. Vol. I at 17.)

{¶ 4} Boquist testified that he was a double amputee from a diabetes infection. Although Boquist could "walk without the help of a cane or a walker," he often used a wheelchair to minimize "unnecessary walking." (Tr. Vol. II at 59.) He worked part-time making sponsored placemats for restaurants and as a church music director. (Tr. Vol. II at 60.)

{¶ 5} Between 10:30 and 11:00 p.m. on December 28, 2015, Boquist went to the Chase Bank ATM at the corner of North 3rd and East Broad Street in downtown Columbus to deposit a $100 check. (Tr. Vol. II at 61.) Boquist was in a wheelchair at the time and arrived by bus. (Tr. Vol. II at 62.) At the ATM, he deposited the check and withdrew $20 for the next day's expenses.

{¶ 6} During the transaction, Williams was standing behind Boquist, who believed he was waiting to use the ATM. (Tr. Vol. II at 62-63.) Boquist testified that Williams said "I know you put some money in there," and demanded $20. (Tr. Vol. II at 64.) Williams claimed that his daughter was sick and would die if he did not obtain money to buy her medicine, and told Boquist "your life is more important than the money." (Tr. Vol. II at 65.) Boquist rolled away in his wheelchair in the direction of a nearby restaurant. He testified that he felt like he was "under a lot of pressure" and "had to do exactly what [Williams] said." (Tr. Vol. II at 65.) As he rolled toward the restaurant, Boquist gave Williams $20 "to get him off my back." (Tr. Vol. II at 66.) However, Williams followed Boquist and "instructed -- almost threatened" Boquist to return to the ATM. (Tr. Vol. II at 66.) Boquist feared that if he "made one false move," Williams would have taken his life. (Tr. Vol. II at 66.) Boquist believed that Williams had a gun because he kept his hand in his right coat pocket during the encounter. (Tr. Vol. II at 67.)

{¶ 7} Back at the ATM, Boquist put his card back in the machine. A series of preset withdrawal amounts appeared on the screen. Williams pressed $500, $400, $300, and $200 until the final amount dispensed. (Tr. Vol. II at 69.) Williams positioned himself to prevent Boquist from accessing the money, which dispersed in $20 bills. (Tr. Vol. II at 73.) Boquist then spotted a man walking east on Broad Street and yelled "help."

(Tr. Vol. II at 74.) Williams ran away, and the man began to chase Williams. (Tr. Vol. II at 74.)

{¶ 8} The man Boquist had called out to was Kwame Danso ("Danso"), who worked as a cleaner for Capital Crossroads, an organization in downtown Columbus that provides security and cleaning services for property owners. (Tr. Vol. II at 5; Tr. Vol. I at 48-49.) In addition to cleaning, Danso would call a dispatcher if he saw anything wrong while working. (Tr. Vol. II at 7.) At 10:50 p.m. on December 28, 2015, Danso was on his way back to the office when he saw two men at the Chase Bank ATM at Third and Broad. *Id.* Danso testified that one of them called to him for help. The other man turned, saw Danso, and ran away. Danso used his radio to call his office and reported that someone had been robbed at the Chase Bank ATM. (Tr. Vol. II at 8-9.)

{¶ 9} Williams turned and began to run east on the north side of Broad Street. (Tr. Vol. II at 10-11.) Danso and several of his co-workers communicated over the radio with each other about Williams' position as they pursued him. (Tr. Vol. II at 12-13.) Danso met up with a co-worker during the chase, but they lost sight of Williams after he jumped a parking lot fence. (Tr. Vol. II at 14.) Danso and the co-worker split up to continue the search. Danso then met up with another co-worker, after which Williams reappeared near Gay and High Street. (Tr. Vol. II at 14-15.) Columbus police appeared and apprehended Williams on the southeast corner of that intersection. (Tr. Vol. II at 16.) Danso recognized Williams based on his clothing, which included blue plants and a red hoodie. (Tr. Vol. II at 16-17.) Danso and his co-workers had been running while chasing Williams. A detective briefly interviewed Danso to confirm that he had seen Williams at the ATM. (Tr. Vol. II at 18-19.)

{¶ 10} Several Columbus police officers who were at the scene testified at trial. Officer Zackary Weekley was in a patrol car in the area with his partner when a call came over the dispatch describing the robbery and chase in progress. (Tr. Vol. III at 95-98.) The suspect was described as a black male wearing a red toboggan and a dark shirt. Weekley personally observed Williams being chased, pulled the patrol car over, and arrested him. (Tr. Vol. III at 98-99.) In a search incident to the arrest, Weekley recovered $200 in $20 bills from Williams' pocket. The bills were "folded in half" when discovered. (Tr. Vol. III at 99-100.) Within ten minutes of the arrest, Boquist was brought to the scene and he identified Williams as the robber. (Tr. Vol. III at 103-04.)

{¶ 11} Officer Christopher Bailey also testified. On the day in question, he was working in uniform and in a marked cruiser as a special duty officer for Capital Crossroads. (Tr. Vol. III at 123.) This involved assisting their employees with security and being available on their radio system in case the employees needed a uniformed police officer. (Tr. Vol. III at 124.) Bailey heard Danso's report of the robbery over the radio system and immediately relayed the information to the Columbus police dispatcher, including a description of the suspect. (Tr. Vol. III at 125.) Bailey authenticated a compact disc recording of the radio transmission, which was admitted at trial as the state's exhibit H. (Tr. Vol. III at 130.)

{¶ 12} Williams objected to the admission of the recording, stating that he was at a disadvantage because he had only been able to listen to "snippets" of the recording before trial. (Tr. Vol. III at 128.)

{¶ 13} Detective Jack Morris, a robbery detective with the Columbus Police, took photographs of Williams and the money recovered from him after the arrest. (Tr. Vol. IV at 15-16.) He testified that the cash he photographed looked "fairly new" and the bills had "appeared to be folded on top of each other." (Tr. Vol. IV at 16-17.)

{¶ 14} Williams testified on his own behalf. He claimed that he was innocent and the case was one of "mistaken identity." (Tr. Vol. V at 4.) Williams testified that he had been drinking at a bar with a friend a few hours before he was arrested. At the bar, he bought drinks, gave the DJ money to play songs, and played pool. (Tr. Vol. V at 4, 8-9.) Williams used drugs during this period of his life and was able to afford them himself. (Tr. Vol. V. at 4-5.) Williams stated that the day before he went to the bar, he had $1,500 in $20 bills, and that he had posted a video of himself counting the money out on Facebook. (Tr. Vol. V at 5-6.)

{¶ 15} Williams recounted that he left for the bar with exactly $200 in cash because he planned to spend the night in a hotel with a female companion. (Tr. Vol. V at 9.) After leaving the bar, a friend of his drove him downtown, where the hotel was located. On the way, Williams took a mixture of illegal drugs including cocaine, heroine, and barbiturates. (Tr. Vol. V at 9-11.) After Williams got out of his friend's car, he tried to go back to it, but could not remember where it had been parked. (Tr. Vol. V at 14-15.) He noticed the Capital Crossroads employees following him and thought they were police officers. (Tr. Vol. V at 16.) Williams began to walk faster because it was cold and he

wanted to get back to his friend's car, but was stopped and arrested after being seen by officers in a cruiser. (Tr. Vol. V at 17-18.) Williams admitted that he provided the officers with false information about his identity because he had outstanding warrants. (Tr. Vol. V at 22-24.)

{¶ 16} During cross-examination, the prosecution played a videotape of Williams being questioned by a detective after his arrest. (Tr. Vol. VI at 3.) During the questioning, Williams claimed to know nothing about a robbery. He stated that he was a homosexual who had been drinking in a park with his boyfriend before being arrested. (Tr. Vol. VI at 6.) After the tape played, Williams denied being a homosexual and stated that he did not remember the conversation on the recording. (Tr. Vol. VI at 10-11.) He acknowledged that what was said on the tape and what he had testified to in court were "two different stories." (Tr. Vol. VI at 14.) After Williams objected to the admission of the tape because he had not been able to view it before trial, the trial court excluded the videotape, stating that it was only of "marginal relevance." (Tr. Vol. VI at 35.)

{¶ 17} The trial court found Williams guilty of both counts of robbery and sentenced him to six years of incarceration. (Apr. 11, 2016 Jgmt. Entry.) Williams now appeals, and asserts the following assignments of error:

> [I.] THE TRIAL COURT ABUSED ITS DISCRETION BY ADMITTING EXHIBIT H AND ALLOWING TESTIMONY ON EXHIBIT I AFTER DISCOVERY RULE VIOLATIONS DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.
>
> [II.] THE TRIAL COURT ERRED BY FAILING TO INQUIRE INTO THE VICTIM'S STATEMENTS MADE AFTER HIS TRIAL TESTIMONY TO PROSPECTIVE WITNESSES DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.
>
> [III.] THE VERDICT RENDERED BY THE TRIAL COURT WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE DEPRIVING APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND

FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION AND COMPARABLE PROVISIONS OF THE OHIO CONSTITUTION.

[IV.] THE TRIAL COURT ERRED BY FINDING APPELLANT GUILTY AND THERE BY DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY PROVISIONS OF THE OHIO CONSTITUTION BECAUSE THE VERDICT OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## II. FIRST ASSIGNMENT OF ERROR

{¶ 18} Williams' first assignment of error asserts that a discovery violation occurred under Crim.R. 16 because he did not have an adequate opportunity to review exhibit H and exhibit I before trial and the trial court's rulings concerning these exhibits infringed on his constitutional right to due process.

{¶ 19} Crim.R. 16, which governs discovery in criminal proceedings, exists "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A). The prosecution must provide any evidentiary materials "which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial" upon written request of the defendant. Crim.R. 16(B). If a party fails to comply with these disclosure requirements, the trial court has the discretion to "order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1).

{¶ 20} Appellate courts apply an abuse of discretion standard to evidentiary rulings, including rulings to exclude or admit evidence subject to the discovery provisions of Crim.R. 16. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court"); *State v. Parson*, 6 Ohio St.3d 442, 445 (1983) (applying abuse of discretion standard to a ruling under Crim.R. 16).

{¶ 21} The Supreme Court of Ohio has held that "prosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the

prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 79, 2005-Ohio-5981, citing *Parson*.

{¶ 22} As an initial matter, we note that all three of the *Parson* factors must be present to demonstrate reversible error under Crim.R. 16. *State v. Davis*, 10th Dist. No. 08AP-443, 2009-Ohio-1375, ¶ 25-27 (applying *Jackson*, which "sets forth the three [*Parson*] elements in the conjunctive"); *State v. Wiley*, 10th Dist. No. 10AP-679, 2011-Ohio-3595, ¶ 15. Thus, Williams' admission that "it is clear that the State did not willfully commit a discovery violation" precludes any demonstration of error under Crim.R. 16. (Appellant's Brief at 18.) He acknowledges that the prosecution attempted to provide him with the materials. However, due to the jail's policy against allowing detainees access to compact discs and his own decision to proceed without an attorney intermediary who might have been able to assist him, he was only able to access a portion of the radio transmissions in exhibit H before trial. *Id.*

{¶ 23} Thus, Williams cannot demonstrate error under Crim.R. 16. However, even if prosecutors had willfully withheld evidence from him, Williams fails to demonstrate error under the second and third *Parson* factors with regard to either exhibit. Exhibit H contained recordings of the police radio transmissions that occurred during the pursuit. (Tr. Vol. III at 127-28.) Williams did review "snippets" of the recording before trial, but he does not explain how reviewing the rest of the recording would have aided his defense. The portion that was played during trial was very brief and consisted mainly of a dispatcher describing an African-American man wearing "possibly a red toboggan, red shirt, and blue jeans" suspected of committing a robbery, as well as updates on the suspect's location during the chase. (Tr. Vol. III at 131-35.) Williams asserts that access to this recording would have helped him "point out the inconsistencies involving the evidence" and "assist [him] in his cross examination of all witnesses," but does not describe even one of these inconsistencies or how the information on the recording would have assisted his cross-examination of witnesses. (Appellant's Brief at 19.)

{¶ 24} Furthermore, Williams fails to explain the prejudice required under *Parson.* He simply makes the conclusory assertion that he was prejudiced by the admission of exhibit H. *Id.* However, as noted, Williams points to no inconsistent statement by a witness that he was prevented from pointing out because of a lack of complete access to

exhibit H before trial that might have allowed him to impeach a witness or otherwise undermine the state's case against him. Without some explanation of how his defense suffered a disadvantage that pretrial review of exhibit H would have prevented, he cannot demonstrate the prejudice required by *Parson*.

{¶ 25} Williams also fails to demonstrate that trial court's ruling on exhibit I was erroneous under *Parson*. The exhibit consisted of a video recording of a detective questioning Williams after his arrest. After the trial court reviewed the video, it sustained Williams' motion to exclude it from evidence, stating that the video had "only marginal relevance." (Tr. Vol. VI at 35.) According to Williams, because the statements he made on the video were inconsistent with his trial testimony, reviewing it "left the court with a preconceived opinion that [he] was not truthful." (Appellant's Brief at 20.) This argument fails under *Parson* because, in addition to it being unclear how having access to the evidence before trial would have assisted his defense, Williams was not prejudiced by the trial court's decision to exclude evidence that would have damaged his credibility.

{¶ 26} What Williams appears to be asserting is that the trial court erred simply by reviewing the video in question. There are several problems with this argument. First, "the very nature of the duties of a judge often require him to have knowledge of inadmissible evidence. Every time he makes a ruling determining evidence inadmissible, he has to know what the inadmissible evidence consists of, and if he is the fact finder, he must eliminate same from his consideration in determining the facts." *Hawkins v. Marion Corr. Inst.*, 62 Ohio App.3d 863, 869 (3d Dist.1990). Thus, the finder of fact's awareness of inadmissible evidence is an unavoidable consequence of a defendant's decision to forego a jury trial in favor of a bench trial.

{¶ 27} Furthermore, in a bench trial, "a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." *State v. Eubank*, 60 Ohio St.2d 183, 187 (1979). *See also State v. Proffitt*, 12th Dist. No. CA2016-07-134, 2017-Ohio-1236, ¶ 34, fn. 5, citing *Eubank* (stating that "in a bench trial, as a trial court is presumed to act properly in consideration of the evidence"). Williams has made no argument to address, much less overcome, the presumption of regularity the law attaches to the trial court's consideration of the evidence. As mentioned, the trial court excluded the evidence that Williams believes would have prejudiced him. Without some demonstration that the trial court improperly

relied on the excluded evidence, the trial court's review of the video did not prejudice Williams. There is no basis for finding that a discovery violation occurred or that the trial court erred or abused its discretion under *Parson*. The first assignment of error is overruled.

## III. SECOND ASSIGNMENT OF ERROR

{¶ 28} In Williams' second assignment of error, he argues that the trial court erred by failing to adequately "inquire into the victim's statements made after his trial testimony to prospective witnesses," thereby violating his right to a fair trial. (Appellant's Brief at 22.) He believes that the trial court should have applied a remedy applicable to a violation of an order for separation of witnesses under Evid.R. 615, such as a mistrial. (Appellant's Brief at 23-25.)

{¶ 29} A trial court's ruling concerning the separation of witnesses "is ordinarily a decision within the sound discretion of the trial court." *State v. Smith*, 49 Ohio St.3d 137, 142 (1990).

{¶ 30} The record reflects that Boquist spoke with several of the prosecution's other witnesses outside the courtroom, including Capital Crossroads employees involved in the pursuit of Williams. The prosecutor informed the trial court that she did not believe that the witnesses were talking about the trial, and that she "did separate them once it was brought to [her] attention." (Tr. Vol. IV at 5.) The trial court noted that, although there was no order of separation in place, attempts were usually made to keep witnesses separate. *Id.*

{¶ 31} In this case, Williams fails to demonstrate any abuse of discretion by the trial court. First, the discussion between the prosecution and the trial court does not support Williams' assertion that the trial court failed to make an adequate inquiry. The prosecution adequately communicated to the trial court the outlines of what had occurred. The trial court, mindful of its role as the trier of fact, discouraged the prosecution from repeating any specific non-testimonial statement by a witness, but did make inquiries as to which witnesses Boquist spoke to. (Tr. Vol. IV at 5-7.)

{¶ 32} Furthermore, as the trial court noted, there was no order in place for a separation of witnesses. However, even if such an order had been in place, Williams fails to demonstrate how this discussion would have violated it. Typically, an order for the separation of witnesses "is effective only to require the exclusion of witnesses from the

hearing during the testimony of other witnesses." Evid.R. 615(A). It is true that the rule may encompass discussions between witnesses outside the courtroom. For example, in *State v. Waddy*, 63 Ohio St.3d 424, 434 (1992), an appellant argued that the pre-testimonial discussion between a detective and a witness amounted to a violation of a separation order, even though the rule only requires the separation of witnesses during testimony. The Supreme Court of Ohio noted that the purpose of such an order is to prevent witnesses from hearing other testimony and then "tailor[ing] their own testimony accordingly. Thus, a spectator or witness may not tell a prospective witness what has taken place in court if the judge has ordered separation of witnesses." *Id. Waddy* held that the discussion in question "violated neither the letter nor the spirit of the separation order" because nothing in the record indicated that the witnesses had tailored their testimony. Here, as well, there is no indication that the witnesses tailored or altered their testimony. Williams points to no suspicious similarities in their statements on the stand that might suggest that they coordinated their testimony. Because there is no indication of such irregularity in the record, Williams fails to demonstrate that the trial court erred in how it addressed the witnesses' out-of-courtroom discussion. The second assignment of error is overruled.

## IV. THIRD AND FOURTH ASSIGNMENTS OF ERROR

{¶ 33} In the third and fourth assignments of error, Williams argues that the evidence was legally insufficient to convict him and that his conviction was against the manifest weight of the evidence.

{¶ 34} Two different legal standards apply to the legal sufficiency of the evidence and the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different"). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 37, citing *Thompkins*. "Sufficiency is a test of adequacy." *Id.* "The standard when testing the sufficiency of the evidence ' "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61 Ohio

St.3d 259 (1991), paragraph two of the syllabus. A reviewing court "will not disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶ 35} R.C. 2911.02, which defines the crime of robbery, states:

> (A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control;
>
> (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;
>
> (3) Use or threaten the immediate use of force against another.

{¶ 36} A conviction obtained under R.C. 2911.02(A)(2) is a felony of the second degree, while one under R.C. 2911.02(A)(3) is a felony of the third degree. R.C. 2911.02(B). Williams was convicted of one count under each.

{¶ 37} Williams argues that the evidence was legally insufficient to support either conviction. He argues that Boquist's testimony was "inconsistent" because he could not remember whether or not he initially gave the robber $20 or whether he was touched or not. Williams also argues the fact that the robber had kept his hand in his pocket was insufficient to prove the threat of physical harm or force necessary. (Appellant's Brief at 29-31.)

{¶ 38} Contrary to Williams' assertion, Boquist's testimony was not inconsistent. He stated that he gave Williams $20 after Williams demanded it from him. (Tr. Vol. II at 64-66.) Boquist also stated several times that Williams touched his fingers when grabbing the cash out of the ATM. (Tr. Vol. II at 73; Tr. Vol. III at 33, 39.)[1]

{¶ 39} Based on the evidence presented, a rational trier of fact could have found both that Williams threatened to inflict physical harm and that he threatened the

---

[1] Williams' briefing makes several attempts to undermine Boquist's testimony without any citation to the record. For example, he asserts that Boquist "did not see the suspect's face," but cites to no portion of Boquist's testimony to support this assertion. (Appellant's Brief at 31.) During his testimony, Boquist described what the suspect was wearing at the time of the robbery, his height and his approximate age. (Tr. Vol. II at 76-77.) Furthermore, Boquist identified Williams at the scene as the robber. *Id.*

immediate use of force against Boquist when committing theft. Williams threatened Boquist by stating "your life is more important than the money," and Boquist felt that he "had to do exactly what [Williams] said." (Tr. Vol II. at 65.) Boquist testified that he was afraid that if he "made one false move," Williams would have taken his life with what Boquist believed was a gun, based on Williams keeping his hand in his right coat pocket during the robbery. (Tr. Vol II. at 66-67.) Williams demanded money from Boquist "three or four times." (Tr. Vol II. at 75.) In response, Boquist gave Williams $20, who then forced Boquist to withdraw an additional $200 from the machine. Williams was apprehended with $200 in crisp, new $20 bills and Boquist identified Williams as the robber. A rational trier of fact could conclude that Williams wanted Boquist to believe he had a gun by keeping his hand in his pocket and making the threatening statements that Boquist recounted. The state's evidence was legally sufficient to prove all of the applicable elements of robbery under R.C. 2911.02(A).

{¶ 40} Turning to the manifest weight of the evidence analysis, this court must consider the state's evidence as an additional, or "thirteenth juror." *Thompkins* at 387. After " 'reviewing the entire record,' " the appellate court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, quoting *Martin*.

{¶ 41} Williams argues that his conviction was against the manifest weight of the evidence, citing Boquist's purported inconsistency in testifying and the fact that the Capital Crossroads employees did not have the suspect in their sight at all times during the chase. Williams also points to differences between the evidence recovered from his person and Boquist's testimony, such as the fact that he did not have Boquist's wallet or bank card. (Appellant's Brief at 37-38.)

{¶ 42} After reviewing the record, we conclude that there was more than ample evidence to convict Williams of both counts of robbery. Boquist positively identified Williams as the robber, the cash found on Williams was consistent with the cash stolen from Boquist, and, as discussed, the threats made by Williams supported the elements of

robbery. Furthermore, the testimony of all the Capital Crossroads employees filled in the timeline after the robbery and before the arrest. Williams points to no substantive inconsistency in the state's evidence that diminishes its weight.

{¶ 43} Contrary to Williams' assertion, Boquist's testimony was not inconsistent on any material fact used to support the state's case, as discussed. Furthermore, it was Boquist's identification of Williams after the arrest, not that of the Capital Crossroads employees, that was crucial to the state's case. Thus, the fact that the employees momentarily lost sight of the suspect during the chase does not detract from the weight of the evidence against Williams. Finally, the most rational inference for Williams not having Boquist's wallet on his person when apprehended is that a fleeing suspect will drop incriminating evidence, not that the police arrested the wrong person. Because Williams' conviction was not legally insufficient and was supported by the manifest weight of the evidence, the third and fourth assignments of error are overruled.

## V. CONCLUSION

{¶ 44} Williams has failed to demonstrate that the trial court erred in its evidentiary rulings or its handling of the witnesses. Nor has he demonstrated the legal insufficiency of the evidence used to convict him of second and third degree robbery or that his convictions were against the manifest weight of the evidence. Accordingly, we overrule each of appellant's four assignments of error and affirm the judgment of the trial court.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

———————————