[Cite as *State v. Berry*, 2021-Ohio-1132.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

      v.

JONATHAN E. BERRY,

      DEFENDANT-APPELLANT.

CASE NO. 14-20-05

O P I N I O N

---

Appeal from Union County Common Pleas Court
Trial Court No. 2019-CR-0028

**Judgment Affirmed**

**Date of Decision:  April 5, 2021**

---

APPEARANCES:

    *Rocky Ratliff* **for Appellant**

    *Andrew M. Bigler* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Jonathan E. Berry ("Berry") appeals the judgment of the Union County Court of Common Pleas. In this case, Berry was charged with five counts of aggravated trafficking in drugs and one count of involuntary manslaughter. Doc. 1. Four of the counts of aggravated trafficking in drugs arose from controlled buys. Ex. 202, 209, 215, 222. The fifth count of aggravated trafficking in drugs arose from an alleged transaction between Berry and Ashley Russell ("Ashley"). After this alleged transaction, Ashley died from a drug overdose, giving rise to the charge of involuntary manslaughter. Doc. 1. On appeal, Berry raises ten assignments of error that challenge various aspects of his jury trial. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Ashley and her two children lived with her parents in Marysville, Ohio. Jan. 14 Vol. II Tr. 93. Ex. 230. She and her two children moved into her parents' house in Marysville, Ohio after she began battling a drug addiction. Jan. 14 Vol. II Tr. 28, 30-31. Ex. 256. Ashley was friends with Berry and would drive him places since he did not have a driver's license. Jan. 14 Vol. II Tr. 36, 50, 132. Jan. 15 Vol. II Tr. 328. Ashley's mother, Tonya Russell ("Tonya"), suspected that Ashley and Berry were doing drugs together. Jan. 14 Vol. II Tr. 38. Tonya texted Berry "[t]o tell him * * * that I knew he was selling her [Ashley] drugs or giving them to her * * * and I wanted it to stop." Jan. 14 Vol. II Tr. 38. However, in

response, Berry insisted that he was "cutting ties with * * * dope" and that they were just "spending time together." Jan. 14 Vol. II Tr. 52.

{¶3} Deputy Rod Wilson ("Deputy Wilson") of the Union County Sheriff's Office testified that he became acquainted with Berry through several complaints that his office had received. Jan. 13 Vol. II Tr. 5, 7. In February of 2017, the police conducted a traffic stop of a vehicle and found methamphetamines in the possession of G.C. Jan. 13 Vol. II Tr. 7. Pursuant to an agreement with the Union County Prosecutor's Office ("defendant's agreement"), G.C. consented to work with the police as a confidential informant. Ex. 229. Jan. 13 Vol. II Tr. 8. G.C. would participate in four controlled-buy operations that had Berry as their target. Jan. 13 Vol. II Tr. 7.

{¶4} On April 7, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. Ex. 199, 200, 202. G.C. walked to an area behind a local repair shop where he had arranged a meeting with Berry. Ex. 202. G.C. returned to Deputy Wilson with $40.00 and a white powdery substance. Ex. 199, 200. This substance was later tested and found to contain methamphetamines. Ex. 225. *See* Jan. 13 Vol. II Tr. 21-24, 27-28, 35-39.

{¶5} On April 27, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. Ex. 206, 207. G.C. walked to a nearby parking lot at a local shopping plaza where he had arranged to meet Berry. Ex. 209. G.C. returned to Deputy Wilson with $20.00 and a crystalline substance. Ex. 206. This

substance was later tested and found to contain methamphetamines. Ex. 226. *See* Jan. 13 Vol. II Tr. 56-60, 64-65, 70-71.

{¶6} On June 16, 2017, Deputy Wilson issued $80.00 to G.C. to purchase methamphetamines from Berry. Ex. 212, 213, 215. G.C. again walked to a nearby parking lot at a local shopping plaza where he had arranged to meet Berry. Ex. 215. G.C. returned to Deputy Wilson with a crystalline substance and no excess funds in his possession. Ex. 212, 213. This substance was later tested and found to contain methamphetamines. Ex. 227. *See* Jan. 13 Vol. II Tr. 75, 77-80. This was the final controlled-buy operation involving Berry before Ashley's death. Ex. 258.

{¶7} On June 18, 2017, Berry engaged in a text exchange with Ashley. Ex. 173. Berry texted Ashley: "I got ur Chinese." Ex. 173. At trial, Detective Seth McDowell ("Detective McDowell") of the Union County Sheriff's Office testified that "Chinese" is used as a name for a compound that "contains fentanyl, whether it is made up of heroin and/or methamphetamine." Jan. 15 Vol. II Tr. 350. During this exchange, Ashley texted, "So how can I get that from you?" Ex. 177. Berry then texted, "Give me a few want to wait till on the morning and come get it after u drop ur boys." Ex. 179.

{¶8} On June 19, 2017 at 7:40 A.M., the following text exchange took place between Ashley and Berry:

**[Berry]: I. In town babe I need u**

Case No. 14-20-05

> **[Ashley]: Ok im getting ready to take [my son] to daycare. Where will you be?**
>
> **[Berry]: Parking g lot of the Dollar tree * * ***
>
> **[Ashley]: I am hurrying. My mom doesnt leave until 9 so shes still here.**

Doc. 193, 194. At 8:48 A.M., the following exchange occurred:

> **[Ashley]: Did you bring that gor meet**
>
> **[Ashley]: Im righy by yhe YMCA**
>
> **[Berry]: Coming out of house.e depot**
>
> **[Berry]: Home depot**
>
> **[Ashley]: Im here in front of laen mowers**
>
> **[Berry]: Coming**

Doc. 195. At trial, the State introduced footage from a security camera at Home Depot that captured images of Berry and Ashley walking together. Ex. 248. Jan. 16 Vol. I Tr. 61-62.

{¶9} At around 1:00 P.M., Ashley's Aunt, Lisa Crumb ("Crumb"), stopped by Ashley's residence during her (Crumb's) lunch break from work. Jan. 15 Vol. II Tr. 298. Crumb testified that she went to Ashley's house to borrow a hair dryer. Jan. 15 Vol. II Tr. 299. She further stated that, at the time of her visit, Ashley's children were in the swimming pool. Jan. 15 Vol. II Tr. 299. During their conversation, Crumb learned that Ashley had met Berry that morning at Home

Depot. Jan. 15 Vol. II Tr. 299-300. After using the hair dryer, Crumb then returned to work. Jan. 15 Vol. II Tr. 300.

{¶10} On the afternoon of June 19, 2017, Ashley's aunt, Gayla Wooldridge ("Wooldridge"), was visiting her parents ("Ashley's grandparents") at their house. Jan. 15 Vol. II Tr. 270-271. Ashley's grandparents lived down the street from Ashley. Jan. 15 Vol. II Tr. 270-271. Wooldridge stated that, during her visit, Ashley's six year old son came to Ashley's grandparents' house to report "that he thought something was wrong with Ashley." Jan. 15 Vol. II Tr. 270-271. *See* Jan. 14 Vol. II Tr. 31. Wooldridge then went to check on Ashley. Jan. 15 Vol. II Tr. 271. Wooldridge went to Ashley's house with her nephew, M.R. Jan. 15 Vol. II Tr. 276.

{¶11} When Wooldridge arrived at Ashley's residence, the front door was open. Jan. 15 Vol. II Tr. 271. Wooldridge walked into the house and went to the upstairs bathroom. Jan. 15 Vol. II Tr. 271. The bathroom door was locked, so she and M.R. found the key and opened the door. Jan. 15 Vol. II Tr. 217. They then saw Ashley lying on the floor in the bathroom. Jan. 15 Vol. II Tr. 271. Ashley was unresponsive and was, by that point, turning blue. Ex. O. Wooldridge then called 9-1-1. Jan. 15 Vol. II Tr. 272.

{¶12} The emergency squad arrived at Ashley's residence and transported her to the hospital where she was declared dead at 5:07 P.M. Jan. 15 Vol. I Tr. 7, 18, 124. Crumb went to the hospital when she heard about Ashley. Jan. 15 Vol. II

Tr. 300. Crumb spoke with the law enforcement officers who were at the hospital and informed them that Ashley had met Berry that morning at Home Depot. Jan. 15 Vol. II Tr. 300.

{¶13} The police examined the bathroom where Ashley was found. Jan. 16 Vol. I Tr. 16. Corporal Nathan Stone ("Corporal Stone") discovered a hypodermic needle, a Q-tip with the end ripped off, and a make-up bag behind the bathroom door. Jan. 16 Vol. I Tr. 18. Ex. 234. He determined that this make-up bag was, based on its contents, a "rig bag." Jan. 16 Vol. I Tr. 19. At trial, he explained that a rig bag contains "all the items [a drug user] would need to shoot up, smoke, whatever you want to administer." Jan. 16 Vol. I Tr. 19. During the investigation into Ashley's death, the police recovered Ashley's cell phone from her residence. Jan. 16 Vol. I Tr. 23. Her cell phone contained text messages that indicated she was a drug user and was in contact with Berry. Jan. 16 Vol. I Tr. 31, 36.

{¶14} Corporal Stone also discovered a white powdery substance that was in a plastic baggie that had been placed into another plastic baggie. Jan. 16 Vol. I Tr. 33. Ex. 247. He stated that this package "looked like * * * it had been packaged for distribution" and looked like it had "never been opened." Jan. 16 Vol. I Tr. 122. This white powdery substance was subsequently tested and found to contain fentanyl and ketamine. Jan. 15 Vol. I Tr. 69. Ex. 253.

{¶15} The police decided to have G.C. perform a fourth controlled-buy operation with Berry as part of the investigation into Ashley's death. Jan. 13 Vol.

II Tr. 89. On June 21, 2017, Deputy Wilson issued $85.00 to G.C. to purchase a gram of methamphetamines from Berry. Ex. 221, 222. This time G.C. went to Berry's residence for the drug transaction. Ex. 222. During this operation, G.C. spoke with Berry about Russell. Jan. 16 Vol. I Tr. 60.

{¶16} A recording of this conversation was admitted at trial. Ex. 224. Speaking to G.C., Berry said that he had seen Ashley on the day of her death and that she had given him $15.00 for a ride to Columbus. Jan. 16 Vol. I Tr. 60. G.C. returned from Berry's house with a crystalline substance and no excess funds in his possession. Ex. 221, 219. This substance was later tested and found to contain methamphetamines. Ex. 228. *See* Jan. 13 Vol. II Tr. 89-91, 93-97.

{¶17} On August 29, 2017, Dr. Bryan D. Casto ("Dr. Casto") conducted a postmortem examination of Ashley's remains. Ex. 255. He concluded that the cause of Ashley's death was "[m]ultiple drug intoxication (fentanyl, amphetamine/ methamphetamine)." Ex. 255. On September 5, 2017, Dr. David Applegate ("Dr. Applegate"), the Union County Coroner, determined that Ashley's death had been an accident, having resulted from a drug overdose. Ex. 258.

{¶18} On February 15, 2019, Berry was indicted on five counts of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), felonies of the fourth degree. Doc. 1. Four of these counts of aggravated trafficking in drugs arose from the four controlled-buy operations between G.C. and Berry. Mar. 6 Tr. 32. One of these charges for aggravating trafficking in drugs arose from the alleged

transaction between Ashley and Berry at Home Depot on June 19, 2017. Mar. 6 Tr. 32. Berry was also indicted on one count of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree. Doc. 1.

{¶19} Berry's jury trial was held in between January 13 and January 16, 2020. Jan. 13 Vol. I Tr. 1. Jan. 16 Vol. I Tr. 1. At trial, the State called G.C. to testify. Jan. 14 Vol. I Tr. 114. However, G.C. invoked his Fifth Amendment right against self-incrimination and refused to testify. Jan. 14 Vol. I Tr. 126. The State then granted G.C. immunity "as it relates to, one, any questions asked by the prosecutor this afternoon; and, two, specifically as it relates to any events" connected to the four controlled-buy operations. Jan. 14 Vol. I Tr. 134. The trial court then informed G.C. that he did not have a Fifth Amendment right against self-incrimination in this context and that he must testify or be found in contempt. Jan. 14 Vol. I Tr. 135. However, G.C. still refused to testify. Jan. 14 Vol. I Tr. 152. The trial court then held G.C. in contempt. Jan. 14 Vol. I Tr. 160.

{¶20} After the State rested, the Defense made Crim.R. 29 motions for each of the charges against Berry. Jan. 16 Vol. I Tr. 198-199. The trial court overruled these motions. Jan. 16 Vol. I Tr. 203. The jury then returned verdicts of guilty for each of the six charges against Berry. Doc. 194-199, 201.

{¶21} On March 6, 2020, Berry appeared before the trial court for sentencing. March 6 Tr. 1. The trial court determined that charge of aggravated trafficking in drugs that arose from the alleged transaction between Ashley and

Berry merged with the charge of involuntary manslaughter. Doc. 206. The State elected to proceed to sentencing on the charge of involuntary manslaughter. March 6 Tr. 33. The trial court imposed an eleven-year prison term for Berry's conviction for involuntary manslaughter and then imposed eighteen-month prison sentences for each of Berry's remaining convictions. Doc. 206. The trial court then ordered these prison terms to be served consecutively. Doc. 206. Thus, Berry was sentenced to a "combined prison term * * * [of] 17 years." Doc. 206.

{¶22} The appellant filed his notice of appeal on March 26, 2020. Doc. 215. On appeal, Berry raises the following ten assignments of error:

**First Assignment of Error**

**The record contained insufficient evidence to support a conviction for aggravated possession of drugs in violation of R.C. 2925.03 and for involuntary manslaughter in violation of R.C. 2903.04.[1]**

**Second Assignment of Error**

**The conviction for aggravated possession of drugs in violation of R.C. 2925.03 and for involuntary manslaughter in violation of R.C. 2903.04 was contrary to the manifest weight of the evidence.**

**Third Assignment of Error**

**The trial court erred when it failed to give any jury instruction regarding causation.**

**Fourth Assignment of Error**

---

[1] In the appellant's brief, the assignment of error states that Berry is challenging his conviction for "aggravated possession of drugs." Appellant's Brief, 6, 11. However, Berry was indicted on five counts of aggravated trafficking in drugs. Doc. 1. We will conduct our analysis accordingly.

The trial court erred when it failed to grant a mistrial after the jury was tainted by the statements from a potential juror.

## Fifth Assignment of Error

The trial court erred when it failed to grant a mistrial or a continuance due to late disclosure of the confidential informant's agreement.

## Sixth Assignment of Error

The trial court incorrectly ruled as it pertained to confidential informant's constitutional right against self-incrimination and the subsequent criminal contempt findings prejudiced appellant.

## Seventh Assignment of Error

The trial court erred when it allowed text messages to be entered in violation of appellant's confrontation clause and where hearsay was offered for the truth of the matter asserted.

## Eighth Assignment of Error

The trial court erred when it allowed family members to be present during the trial prior to their testimony being given in violation of any separation of witnesses.

## Ninth Assignment of Error

Appellant was denied his constitutional right to the effective assistance of counsel.

## Tenth Assignment of Error

The trial court erred when appellant received the maximum sentence.

*First Assignment of Error*

{¶23} Berry argues that one of his convictions for aggravated trafficking in drugs and his conviction for involuntary manslaughter are not supported by sufficient evidence.

Legal Standard

{¶24} A challenge to the sufficiency of the evidence supporting a conviction "is a question of law and a 'test of adequacy rather than credibility or weight of the evidence.'" *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 40, quoting *State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19. "The sufficiency-of-the-evidence analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Luebrecht*, 3d Dist. Putnam No. 12-18-02, 2019-Ohio-1573, ¶ 36, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12. On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 8, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 73 (3d Dist.).

Legal Analysis: Aggravated Trafficking in Drugs

**{¶25}** To establish a conviction for the offense of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), the State must prove that the defendant "[1] knowingly * * * [2] [sold] or offer[ed] to sell [3] a controlled substance or a controlled substance analog." R.C. 2925.03(A)(1), (C)(1)(a). On appeal, Berry does not challenge any of the four charges of aggravated trafficking in drugs that arose from the controlled buys with G.C. He only challenges the charge that arose from his June 19, 2017 meeting with Ashley at Home Depot.[2]

**{¶26}** In this case, the State introduced text messages that had been exchanged between Ashley and Berry on June 18 and June 19, 2017. At trial, Lela J. Berry ("Lela"), Berry's mother, was called as a witness and confirmed that the phone number associated with these texts was, in fact, Berry's. Jan. 15 Vol. II Tr. 338. At 5:50 P.M on June 18, 2017, the following text exchange occurred:

> **[Ashley:] Been patient holding…**
>
> **[Berry:] I got ur Chinese**

---

[2] Berry's conviction for aggravated trafficking in drugs for this particular transaction merged with his conviction for involuntary manslaughter at sentencing. Mar. 6 Tr. 32-33. However, to establish a conviction for involuntary manslaughter, the State must prove that the defendant committed a felony that proximately caused the death of another. *Brown, supra*, ¶ 11 (holding "[t]he 'criminal intent of involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence'"), quoting *State v. Potee*, 2017-Ohio-2926, 90 N.E.3d 58, ¶ 32 (12th Dist.). In this case, the State alleged that the offense of aggravated trafficking in drugs arising from the transaction between Ashley and Berry on June 19, 2017 proximately caused the death of Ashley. Thus, Berry's conviction for involuntary manslaughter rests on the State having proved this underlying offense. For this reason, we will examine the record to determine whether the state provided sufficient evidence to support this conviction even though this conviction was merged by the trial court at sentencing.

Doc. 173. At trial, Detective McDowell and Corporal Stone testified about the meaning of the word "Chinese" in this context based upon their knowledge, training, and experience. Jan. 15 Vol. II Tr. 350. Jan. 16 Vol. I Tr. 40.

{¶27} Detective McDowell testified that, in drug vernacular, "Chinese contains Fentanyl, whether it is made up of heroin and/or methamphetamine." Jan. 15 Vol. II Tr. 350. He also confirmed that "Chinese" "relates to the compound of fentanyl" and that the fentanyl "could be in any drug." Jan. 15 Vol. II Tr. 351. He then testified that "when people are seeking out Chinese, they are looking for—or they know that the drug is—there's a strong chance of containing fentanyl." Jan. 15 Vol. II Tr. 351.

{¶28} Corporal Stone testified on the word "Chinese" as follows:

**Chinese is an interesting term or—street term for it is China white.**

**\* \* \***

**China white has changed to some degree and drug vernacular changes at times. Originally, \* \* \* it was high quality white Heroin believed to be from China. And then it has changed to be high quality Fentanyl or Fentanyl laced Heroin \* \* \*. [B]asically, any time you get a white depressant, it's going to be Fentanyl based, a high quality Heroin base but there could be additives in it to make it better.**

Jan. 16 Vol. I Tr. 42. He stated that these additives "could be Methamphetamine, Cocaine, Ketamine" and noted that Ashley died from "intoxication of Fentanyl and Methamphetamine and Amphetamine." Jan. 16 Vol. I Tr. 42.

**{¶29}** Corporal Stone also testified that there are "different qualifiers" for "Chinese," including "slow lane" and "fast lane."  Jan. 16 Vol. I Tr. 40.

> **[I]n the context of this, slow lane, it's going to be depressant * * *. It's a depressant.  It's an opioid.  Fentanyl, Heroin, prescription medications.  Slow lane is typically going to be a depressant.**

Jan. 16 Vol. I Tr. 40-41.  He further confirmed that "slow lane" could encompass "Fentanyl-Methamphetamine * * *, especially when you speak about the Chinese in particular."  Jan. 16 Vol. I Tr. 42.  Based on the context of these text messages, Corporal Stone concluded that, in using the term "Chinese," "[t]hey're not talking about Lo Mein.  They're talking about dope."  Jan. 16 Vol. I Tr. 40.

**{¶30}** At 7:34 P.M on June 18, 2017, the following exchange occurred between Ashley and Berry:

> **[Ashley:]  Did you make it to dinner?**
>
> **[Berry:]  Omfg what a disaster**
>
> **[Berry:]  This b**** is nodding out in her food at the table**
>
> **[Ashley:]   Oh so you can get her that but you won't me?? Unacceptable babe.**
>
> **[Berry:]  I just told you I got it for u**
>
> **[Berry:]  I didn't get it for her I got it for you and she saw it**
>
> **\* \* \***
>
> **[Berry:]  If I showed up to dinner at her house f***ed up like this I would never hear the f***ing end of it.**

Doc. 174-175. At trial, Berry's mother, Lela testified that Berry lives at her house. Jan. 15 Vol. II Tr. 327. She confirmed that Berry's girlfriend came over for dinner one night and had trouble staying awake and "went to sleep." Jan. 15 Vol. II Tr. 329.

{¶31} At 8:42 P.M. on June 18, 2017, the following text exchange occurred:

[Ashley:] **So how can I get that from you?**

[Berry:] **Usually with two tens and a thong**

[Ashley:] **1 I got no problem. . . I hot thongs for days and would be happy to model them for you anytime. . . the 2 tens. . . will you accept IOU's? Lol**

[Berry:] **Yep**

[Berry:] **Give me a few want to wait till on the morning and come get it after u drop ur boys**

[Ashley:] **Do you have any idea how bad I need it for sleeping purposes.**

**\* \* \***

[Ashley:] **You have a continuous flow of energy. . . I do not. I am miserable right now**

**\* \* \***

[Berry:] **C wat I can do**

[Ashley:] **Thank you. . . Thank you. . . Thank you**

Doc. 177, 179, 181. At trial, Corporal Stone testified that the text referring to "two tens and a thong" was discussing payment. Jan. 16 Vol. I Tr. 82-83. He said,

**Two tens meaning $20 and a thong. It's payment for drugs. You pay with money but it's not uncommon to pay with stolen items or with people's bodies or pictures * * * obviously, a thong is a type of underwear but the way I read that context, based on my training, experience and this investigation, she was offering either services or pictures or some type of her body as payment for dope.**

Jan. 16 Vol. I Tr. 82-83. On cross-examination, he confirmed that Ashley had sent pictures of her private areas to obtain drugs. Jan. 16 Vol. I Tr. 167. Further, Detective McDowell testified that he had an interview with Berry after Ashley's death. Jan. 15 Vol. II Tr. 340. During this interview, Berry told McDowell that he obtained Chinese from a person named Dutch "for about approximately $20. * * * $20 at a time." Jan. 15 Vol. II Tr. 350.

**{¶32}** At 10:05 P.M. on June 18, 2017, the following text exchange began:

**[Ashley:] So is that a no go for tonight?**

**[Berry:] Not necisary gimme a few**

**[Ashley:] My fingers are crossed**

**[Ashley:] Just checking in**

**[Ashley:] Wyd?**

**[Berry:] Trying to get a ride**

Doc. 182, 183. Corporal Stone testified that "WYD" was "common vernacular for what are you doing." Jan. 16 Vol. I Tr. 87.

**{¶33}** At 1:26 A.M. on June 19, 2017, the following exchange began:

**[Berry:] You up**

[Ashley:]  Yes

[Berry:]  Wat u doin

[Ashley:]  Nothin. . . wishing I could see you

[Berry:]  I am home at my mom's

[Ashley:]  Wish I could get out there. . .

[Berry:]  Me to

[Berry:]  Lots on my mind. . . .smh

[Berry:]  I saved you some

[Ashley:]  Me too…

[Ashley:]  Thank you

[Berry:]  And if I could find you away here

[Ashley:]  I need to end to this madness

[Berry:]  What madness

[Berry:]  The staying up or the other reality my demons are trying to create

[Ashley:]  Both. . . lol

Doc. 183, 184, 185.

{¶34}  At 7:40 A.M. on June 19, 2017, the following exchange began:

[Berry:]  I. in town babe I need u

[Ashley:]  Ok im getting ready to take [my son] to daycare.  Where will you be?

[Berry:]  Parking g lot of the Dollar tree over heated

\* \* \*

[Ashley:]  I am hurrying.  My mom doesnt leave until 9 so shes still here.

[Berry:]  Call me if can

\* \* \*

[Ashley:]  Did you bring that gor meet

[Berry:]  Im righy by yhe YMCA

[Ashley:]  Coming out of house.e depot

[Berry:]  Home Depot

[Ashley:]  Im here in frony of laen mowers

[Berry:]  Coming

Doc. 193, 194, 195.

{¶35}  Corporal Stone testified that Ashley sent text messages soliciting drugs from several people in the days leading up to her death.  Jan. 16 Vol. I Tr. 178.  However, he also confirmed that, after Ashley had met with Berry at Home Depot on June 19, 2017, "her drug seeking behavior stop[ped]", and that "[s]he didn't try to find drugs after that[.]"  Jan. 16 Vol. I Tr. 178.  Corporal Stone testified that it was the content of the text messages between Ashley and Berry on June 18 and June 19, 2017 that led him to believe that Berry was the most likely suspect in the investigation into Ashley's death.  Jan. 16 Vol. I Tr. 142.

**{¶36}** At trial, Corporal Stone testified that he went to Home Depot and examined their security footage. Jan. 16 Vol. I Tr. 50-51. He stated that he observed Berry, Ashley, and one of Ashley's children together at Home Depot in footage captured on the security cameras. Jan. 16 Vol. I Tr. 50-51. This footage was played for the jurors at trial. Jan. 14 Vol. II Tr. 96, 98. Corporal Stone testified that he could not find another reason for Ashley and Berry to meet at Home Depot aside from a drug related transaction. Jan. 16 Vol. I Tr. 175-176.

**{¶37}** Crumb testified that she had texted with Ashley on the day of her death and had been close with Ashley. Jan. 15 Vol. II Tr. 290, 292. She stated that she had been addicted to prescription pain medication and could relate to Ashley's addiction for that reason. Jan. 15 Vol. II Tr. 291. Crumb stated that she left work during her lunch break on June 19, 2017 to go to Ashley's residence and borrow a hair dryer. Jan. 15 Vol. II Tr. 298. She testified that, after Ashley's death, she informed the police that Ashley had indicated that she had met Berry at Home Depot that morning. Jan. 15 Vol. II Tr. 300.

**{¶38}** Detective McDowell testified that he sat down for an interview with Berry at the Tri County Regional Jail. Jan. 15 Vol. II Tr. 340. During this interview, he asked Berry about "Chinese." Jan. 15 Vol. II Tr. 349. At trial, Detective McDowell testified as follows about this conversation:

> **towards the end of the interview, he had mentioned that when we got into the source of supply of where he would purchase * * * this Chinese from, he had said that he typically purchases from a guy**

**by the nickname of Dutch and Dutch sells him—he usually— typically purchases this Chinese from him for approximately $20.**

Jan. 15 Vol. II Tr. 349-350. Detective McDowell stated that he asked Berry about his source or "plug." Jan. 15 Vol. II Tr. 351-352. In response, Berry stated "[t]hat he [Berry] could get [Detective McDowell] anything [he] wanted * * *." Jan. 15 Vol. II Tr. 352. Detective McDowell also testified that Berry admitted to having done drugs with Ashley. Jan. 15 Vol. II Tr. 359.

{¶39} Jennifer Watson ("Watson"), who is a chemistry technical leader at the Miami Valley Regional Crime Laboratory, testified about the contents of the substance that the police had found in Ashley's residence during the police investigation into her death. Jan. 15 Vol. I Tr. 58. She stated that testing revealed that this white powder contained fentanyl and ketamine. Jan. 15 Vol. I Tr. 60. *See* Ex. 253. Watson testified that fentanyl is a Schedule II controlled substance and that ketamine is a Schedule III controlled substance. Jan. 15 Vol. I Tr. 70. *See* Ex. 253.

{¶40} After viewing the evidence presented by the State at trial in a light most favorable to the prosecution, we find that a rational trier of fact could have concluded that Berry committed the offense of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) on June 19, 2017. Since the State produced some evidence to substantiate each of the essential elements of this offense, we conclude

that this conviction was supported by sufficient evidence. For this reason, this argument is without merit.

Legal Analysis: Involuntary Manslaughter

**{¶41}** To establish a conviction for the offense of involuntary manslaughter in violation of R.C. 2903.04(A), the State has to prove that the defendant "(1) caused the death of another (2) as a proximate result (3) of the offender's committing a felony." *State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 11, citing R.C. 2903.04(A). The "criminal intent of involuntary manslaughter is supplied by the criminal intent to do the underlying unlawful act of which the homicide is a consequence." *State v. Potee*, 2017-Ohio-2926, 90 N.E.3d 58, ¶ 32 (12th Dist.).

**{¶42}** We have already determined that the State provided some evidence for each of the essential elements of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1), a felony of the fourth degree. In so doing, the State provided some evidence to establish the third element of the offense of involuntary manslaughter. *See Brown, supra*, at ¶ 11. We turn now to the other two elements of this offense.

**{¶43}** The text messages that were discovered between Ashley and Berry indicated that Berry had obtained "Chinese" for Ashley. Jan. 16 Vol. I Tr. 39-42. Corporal Stone testified that "Chinese" in drug vernacular referred to a compound that contained fentanyl. Jan. 16 Vol. I Tr. 39-42. Further, Wooldrige testified that she discovered Ashley's body in the bathroom and that she called 9-1-1. Jan. 15

-22-

Vol. I Tr. 271, 284. Zach Welch ("Welch"), a firefighter for the City of Marysville, testified that he was part of the team that responded to this call. Jan. 15 Vol. I Tr. 7. Welch stated that his team administered overdose treatments to Ashley and then brought her to the hospital. Jan. 15 Vol. I Tr. 14, 18.

{¶44} At trial, Dr. Casto testified that Ashley died of a drug overdose and that "there really [was] no other reason for her to be dead. She does not have natural disease, she does not have an injury that would explain her death." Jan. 15 Vol. I Tr. 169. He stated that her cause of death was multiple drug intoxication with "the drugs of significance" being fentanyl and amphetamines/methamphetamine. Jan. 15 Vol. I Tr. 170.

{¶45} Dr. Matthew Juhascik ("Dr. Juhascik"), the chief toxicologist at the Montgomery County Coroner's Office, testified that they found fentanyl and methamphetamines in Ashley's system. Jan. 15 Vol. I Tr. 146. Further, Dr. Applegate testified that, as the Union County Coroner, he had ruled Ashley's manner of death to be an accidental overdose death based upon the findings of the autopsy report from Montgomery County. Jan. 15 Vol. II Tr. 236. *See* Ex. 258.

{¶46} During the police investigation into Ashley's death, Corporal Stone testified that the police found what appeared to be an unused bag of drugs in the bathroom with Ashley but did not report finding any other illicit drugs at the residence during the investigation. Jan. 16 Vol. I Tr. 33. The State introduced testimony that drug paraphernalia was found in proximity to Ashley's body. Jan.

16 Vol. I Tr. 18-19. The police introduced pictures of a needle, a Q-tip, and a rig bag on the bathroom floor where Ashley was found. Ex. 234. Jim Fish ("Fish"), an investigator with the Union County Coroner's Office, testified at trial that Ashley had "fairly new" needle marks on her arm. Jan. 15 Vol. I Tr. 205.

{¶47} After viewing the evidence presented by the State at trial in a light most favorable to the prosecution, we find that a rational trier of fact could have concluded that Berry committed the offense of involuntary manslaughter in violation of R.C. 2925.03(A)(1). Since the State produced some evidence to substantiate each of the essential elements of this offense, we conclude that this conviction is supported by sufficient evidence. As such, Berry's first assignment of error is overruled.

*Second Assignment of Error*

{¶48} Berry argues that one of his convictions for aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) and his conviction for involuntary manslaughter in violation of R.C. 2903.04(A) are against the manifest weight of the evidence.

Legal Standard

{¶49} In a manifest weight analysis, "an appellate court's function * * * is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *."

*State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Appellate courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'**

*State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting *Thompkins* at 387.

{¶50} "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "[I]t is well established that the * * * credibility of the witnesses [is] primarily a matter for the trier of fact." *State v. Gervin*, 2016-Ohio-8399, 79 N.E.3d 59, ¶ 142 (3d Dist.), quoting *State v. Clark*, 101 Ohio App.3d 389, 409, 655 N.E.2d 795 (8th Dist. 1995). "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis: Aggravated Trafficking in Drugs

**{¶51}** We reincorporate the evidence presented under the first assignment of error and proceed to evaluating the evidence presented at trial on the basis of its weight. On cross-examination, Corporal Stone testified that he did not focus alone on Berry as a suspect. Jan. 16 Vol. I Tr. 142. He considered several other contacts in Ashley's phone. Jan. 16 Vol. I Tr. 142. He stated that, in this process, the police interviewed Crumb. Jan. 16 Vol. I Tr. 128. At trial, he confirmed that the police informed Crumb that "she was suspected of bringing drugs to Ashley" during this interview. Jan. 16 Vol. I Tr. 129, 133. He further indicated that Crumb was not initially forthcoming about many details of her relationship with Ashley. Jan. 16 Vol. I Tr. 129-130. He also mentioned that Crumb did not, in her initial statement, mention that she went to see Ashley on June 19, 2017 for the purpose of borrowing a hair dryer. Jan. 16 Vol. I Tr. 133.

**{¶52}** The Defense then questioned Corporal Stone about another contact, S.H., that Ashley had in her phone. Jan. 16 Vol. I Tr. 135. Corporal Stone indicated that he could not verify that S.H. was a drug dealer but could confirm that he had been a drug addict in the past. Jan. 16 Vol. I Tr. 135. The Defense then questioned Corporal Stone about another contact, A.C., that Ashley had in her phone. Jan. 16 Vol. I Tr. 138. Corporal Stone testified that he did not have any information that she was a dealer but could verify that she was an addict. Jan. 16 Vol. I Tr. 138.

**{¶53}** Corporal Stone testified that he determined Berry was the most likely suspect because of the communications between Ashley and Berry in the twelve to

-26-

twenty-four hours before her death. Jan. 16 Vol. I Tr. 142. He testified that he came to the belief that Berry and Ashley met at Home Depot for a drug deal because of the content of the text messages they had exchanged. Jan. 16 Vol. I Tr. 157-158. When asked about Berry's statement to G.C.—that he had seen Ashley on June 19, 2017 so that she could give him $15.00 for a ride—Corporal Stone indicated that this statement did not seem to "correlate" with Berry's actions on that morning. Jan. 16 Vol. I Tr. 155.

{¶54} On cross-examination, Ashley's mother, Tonya, stated that Ashley did get drugs from Berry but also indicated that Ashley had, at times, obtained drugs from other people as well. Jan. 14 Vol. II Tr. 139. She stated that N.C. had been a source of drugs for Ashley before N.C. and Ashley had a falling out. Jan. 14 Vol. II Tr. 114. She also stated that she was not aware of Crumb bringing drugs to Ashley. Jan. 14 Vol. II Tr. 122. The Defense also read the names of around nineteen people that Ashley had contacted in the days before her death. Jan. 14 Vol. II Tr. 108-110. Tonya testified that she did not recognize most of these names. Jan. 14 Vol. II Tr. 108-110. The Defense also questioned Tonya about the various prescription drugs that Ashley had been using around the time of her death. Jan. 14 Vol. II Tr. 116.

{¶55} Having reviewed this evidence produced at trial on the basis of its weight and credibility, we conclude that the evidence in the record does not weigh heavily against Berry's conviction for aggravated trafficking in drugs. Further,

there is no indication in the record that the jury lost its way and returned a verdict against the manifest weight of the evidence. For this reason, this argument is without merit.

Legal Analysis: Involuntary Manslaughter

{¶56} We reincorporate the evidence presented under the first assignment of error for Berry's conviction for involuntary manslaughter and proceed to examining the evidence in the record on the basis of its weight and credibility. At trial, Corporal Stone testified that he examined the contents of several prescription medication bottles in Ashley's residence and searched for other "illicit drugs." Jan. 16 Vol. I Tr. 143. He further testified that he looked to see if the pills inside the bottles matched the prescription. Jan. 16 Vol. I Tr. 143. The Defense also asked about whether there were any indications that Ashley may have committed suicide. Jan. 16 Vol. I Tr. 169. Corporal Stone testified that he did not find any indication that this death was a suicide. Jan. 16 Vol. I Tr. 173. He stated that he had no reason to doubt the assessments of the medical examiners who determined that this death was an accidental overdose death. Jan. 16 Vol. I Tr. 171-172. *See* Ex. 255, 258; Jan. 15 Vol. I Tr. 169-170, 146, 236.

{¶57} Corporal Stone confirmed that Ashley indicated that she was "miserable" in the text messages that she sent to Berry. Jan. 16 Vol. I Tr. 168. The following exchange occurred between defense counsel and Corporal Stone:

> **[Defense Counsel:]  And we know from not only the conversation with Jon Berty [sic] but other people that Ashley was fiending bad up to her death.  Correct?**
>
> **[Corporal Stone:]  I believe she states that.**
>
> **[Defense Counsel:]  And how do you take fiending to mean in the drug world?**
>
> **[Corporal Stone:]  So, dope sick.  You and me, we don't need it. Once they have it in their body, they need it every eight to ten hours or they're going to get the worse sickness you've ever seen. It's a flu-like vomit, diarrhea.  They want death.  * * * If they're wanting it, it's not just them wanting it like me and you want to go get a beer after this.  They physically need it.  It's a psychological, mental and physical thing that they need it.**
>
> **[Defense Counsel:]  And she's oftentimes texting at all hours of the night trying to find it.  Correct?**
>
> **[Corporal Stone:]  Messaging and texting.**

Jan. 16 Vol. I Tr. 168-169.

{¶58}  The Defense also asked Corporal Stone about whether Ashley could have had a stash built up that she could have used on the date of her death.  Jan. 16 Vol. I Tr. 178.  Corporal Stone testified that addicts generally do not keep a stash. Jan. 16 Vol. I Tr. 178.  He stated, "that's very rare.  It's a quick deal.  The best chance you have to catch an addict with their dope is in transit."  Jan. 16 Vol. I Tr. 178-179.  He further stated that:

> **if I buy from you, I'm going to try to set up the next one.  That's typical.  But to have quantities of drugs on them, that's just not because they're using and they're going to use it and deplete it rather quickly.**

Jan. 16 Vol. I Tr. 179. He then stated that, once she got the drugs, Ashley would "use them immediately thereafter or [in] close proximity" to when she obtained them. Jan. 16 Vol. I Tr. 179.

{¶59} Crumb testified that she had given Ashley marijuana in the past but denied transporting drugs to Ashley. Jan. 15 Vol. II Tr. 305. She admitted to having smoked marijuana with Ashley. Jan. 15 Vol. II Tr. 308. Crumb also stated that Ashley had asked her for drugs. Jan. 15 Vol. II Tr. 308. She testified that, upon such requests, she "would just put her off" and "would not get her anything." Jan. 15 Vol. II Tr. 308. She testified that she knew Berry but stated that Berry had never asked her to deliver drugs to Ashley for him. Jan. 15 Vol. II Tr. 308.

{¶60} On cross-examination, Crumb testified that she worked as an STNA at Carriage Court but stated that she did not have any access to drugs. Jan. 15 Vol. II Tr. 310. She also admitted that her initial witness statement to the police did not mention that her purpose in visiting Ashley was to borrow a hair dryer. Jan. 15 Vol. II Tr. 311. But she denied fabricating this detail after she discovered that Ashley had died. Jan. 15 Vol. II Tr. 315. She further admitted to bringing Ashley marijuana but denied taking Ashley any other drugs. Jan. 15 Vol. II Tr. 314, 316.

{¶61} On cross-examination, Wooldridge testified that her nephew, M.R., was present when she discovered Ashley in the bathroom on June 19, 2017. Jan. 15 Vol. II Tr. 276, 278. She stated that M.R. was a drug addict and informed her that he did not see any drug paraphernalia around Ashley's body. Jan. 15 Vol. II Tr.

284. However, she also stated that M.R. was not looking for drug paraphernalia and was tending to Ashley at that time. Jan. 15 Vol. II Tr. 287. On cross-examination, Welch, the first responder, also could not identify the pictures of Ashley's bathroom or the picture of the syringe on the floor. Jan. 15 Vol. I Tr. 32. He stated that he could not recall what the scene looked like at the time he arrived at Ashley's residence on June 19, 2017. Jan. 15 Vol. I Tr. 32. However, his report noted that a syringe was located near to Ashley's body. Jan. 15 Vol. I Tr. 31.

{¶62} While cross-examining Dr. Applegate, defense counsel noted that one of the reports from the Union County Coroner's Office indicated that the family members had forced themselves into Ashley's residence. Jan. 15 Vol. II Tr. 250. Defense counsel noted that the family members had testified that they did not force themselves into the home but only into the bathroom. Jan. 15 Vol. II Tr. 250. Dr. Applegate testified that he "could not dispute that" testimony. Jan. 15 Vol. II Tr. 250. Defense counsel also noted that Dr. Applegate's report indicated that the family members found drug paraphernalia next to Ashley's body. Jan. 15 Vol. II Tr. 250. Dr. Applegate stated that he believed that this fact was supported by information he had received. Jan. 15 Vol. II Tr. 250-251.

{¶63} Defense counsel also noted that the report from the coroner's office indicated that the investigators found a brown paper bag with drugs inside. Jan. 15 Vol. II Tr. 253. The report also stated that "fentamine" was found in this brown paper bag instead of "fentanyl." Jan. 15 Vol. II Tr. 255. However, Dr. Applegate

noted that his secretary had begun to suffer from Alzheimer's disease around the time that this report was produced. Jan. 15 Vol. II Tr. 256. He also testified that the context of this situation did not indicate that Ashley had committed suicide and that he, for this reason, went with the "generally-accepted medical ruling, that overdoses are accidental in nature." Jan. 15 Vol. II Tr. 257.

**{¶64}** Dr. Juhascik testified that they did not find ketamine in Ashley's system. Jan. 15 Vol. I Tr. 143. However, he also stated that ketamine could possibly be present in Ashley's system but that the test simply did not detect this substance. Jan. 15 Vol. I Tr. 148. He further testified that fentanyl and methamphetamine can cause death and noted that the drugs in Ashley's system could also be found in some prescription drugs. Jan. 15 Vol. I Tr. 146, 160.

**{¶65}** Having considered the evidence presented at trial on the basis of its weight and credibility, we conclude that the evidence in the record does not weigh heavily against Berry's conviction for involuntary manslaughter. Further, there is no indication that the jury lost its way and returned a verdict against the manifest weight of the evidence. As such, Berry's second assignment of error is overruled.

*Third Assignment of Error*

**{¶66}** Berry argues that the trial court erred by failing to give a jury instruction on causation for the charge of involuntary manslaughter.

Legal Standard

**{¶67}** "A trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case." *State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, 903 N.E.2d 656, ¶ 10 (3d Dist.). Further, "a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 37, quoting *State v. Adams*, 62 Ohio St.2d 151, 153, 404 N.E.2d 144, 146 (1980). "Generally, appellate courts review alleged errors in jury instructions for an abuse of discretion." *State v. Chavez,* 3d Dist. Seneca Nos. 13-19-05, 13-19-06, and 13-19-07, 2020-Ohio-426, ¶ 58.

**{¶68}** However, if the Defense does not object to a jury instruction or request a specific jury instruction before the trial court, all but plain error is waived on appeal. *State v. Harrison*, 2015-Ohio-1419, 31 N.E.3d 220, ¶ 69 (3d Dist.). Under Crim.R. 52(A), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

> **"In order to find plain error under Crim.R. 52(B), there must be an error, the error must be an 'obvious' defect in the trial proceedings, and the error must have affected 'substantial rights.'"** *State v. Bowsher*, **3d Dist. Union No. 14-07-32, 2009-Ohio-6524, ¶ 12, quoting** *State v. Barnes*, **94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). 'The standard for plain error is whether, but for the error, the outcome of the proceeding clearly would have been otherwise.'** *State v. Hornbeck*, **155 Ohio App.3d 571, 2003-Ohio-6897, 802 N.E.2d 184, ¶ 16 (2d Dist.), citing** *State v. Long*, **53 Ohio St.2d 91, 372 N.E.2d 804 (1978).**

*State v. Taflinger*, 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 17. "The defendant bears the burden of establishing an obvious defect in the proceedings." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 7. Further, the plain error doctrine is applicable in exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Cartlidge*, 3d Dist. Seneca No. 13-18-33, 2019-Ohio-1283, ¶ 11.

{¶69} "Ohio Jury Instructions is a compendium of standard instructions prepared by the Jury Instructions Committee of the Ohio Judicial Conference, and is generally followed and applied by Ohio's courts." *State v. Thompson*, 2d Dist. Montgomery No. 22984, 2010-Ohio-1680, ¶ 174. "The instructions found in Ohio Jury Instructions are not mandatory. Rather, they are recommended instructions based primarily upon case law and statutes * * *." *State v. Martens*, 90 Ohio App.3d 338, 343, 629 N.E.2d 462, 465 (3d Dist.). This Court has previously held that, when a "trial court's instructions closely track the * * * language of the Ohio Jury Instructions," this "suggests their accuracy and comprehensibility." *State v. Smith*, 3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 31.

Legal Analysis

{¶70} On appeal, Berry alleges that the jury instructions for the charge of involuntary manslaughter failed to properly explain causation. R.C. 2903.04(A) defines this crime and reads, in its relevant part, as follows:

-34-

**No person shall *cause* the death of another or the unlawful termination of another's pregnancy as a *proximate result* of the offender's committing or attempting to commit a felony.**

(Emphasis added.) R.C. 2903.04(A). Berry raises two main arguments under this assignment of error. However, since he did not request a specific jury instruction or raise an objection to these jury instructions below, we will review these arguments under the standard for plain error. Jan. 16 Vol. II Tr. 37-44, 67.

{¶71} First, Berry argues that the trial court "failed to give any jury instruction regarding causation." Appellant's Brief, 12. However, the trial court included the following statement in the jury instructions:

> **Before you can find the Defendant guilty of involuntary manslaughter, you must find that the State of Ohio has proven beyond a reasonable doubt that * * * Jonathan E. Berry did cause the death of Ashley Russell.**
>
> **\* \* \***
>
> **Proximate result bears a resemblance to the concept—concept of proximate cause * * * in that Defendant will be held responsible for those foreseeable consequences which are known to be or should be known to be within the scope of risk created by his conduct.**
>
> **\* \* \***
>
> **Proximate cause is an act or failure to act that in the natural and continuous sequence, directly produced the physical harm and without which it would not have occurred. There may be more than one proximate cause. When a negligent act or failure to act of one party combines with the negligence of another to produce the physical harm, the negligence is a cause.**

Jan. 16 Vol. II Tr. 55-56. These statements are very similar to the relevant Ohio

Jury Instructions for causation:

> **1. CAUSE. The state charges that the act or failure to act of the defendant caused (death) (physical harm to [person] [property]). Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the (death) (physical harm to [person] [property]), and without which it would not have occurred.**

2 OJI-CR 417.23.

> **1. OTHER CAUSES NOT A DEFENSE. There may be one or more causes of an event. However, if a defendant's act or failure to act was one cause, then the existence of other causes is not a defense.**

2 OJI-CR 417.25.[3]

{¶72} The offense of involuntary manslaughter includes the elements of

causation and proximate result. R.C. 2903.04(A). A review of the jury instructions

reveals that the trial court explained both of these elements, in part, by using the

rubric provided by the concept of proximate cause. Jan. 16 Vol. II Tr. 55-56. *See*

*State v. Carpenter*, 2019-Ohio-58, 128 N.E.3d 857, ¶ 51 (3d Dist.) (holding that

"Ohio law generally defines 'cause' in criminal cases identically to the definition of

'proximate cause' in civil cases."); *State v. Chambers*, 53 Ohio App.2d 266, 373

N.E.2d 393 (9th Dist. 1977) (holding that "the legislature intended to follow the

theory of proximate cause" as the basis of liability in R.C. 2903.04.); *State v. Baksi*,

---

[3] The Ohio Jury Instructions for involuntary manslaughter in OJI-CR 503.04 do not contain a separate definition for causation but directs attorneys to use the general jury instructions for causation contained in OJI-CR 417.23, OJI-CR 417.25. 2 OJI-CR 503.04.

11th Dist. Trumbull No. 98-T-0123, 1999 WL 1299297, *13 (Dec. 23, 1999). Use of this language is not an indication that the trial court failed to instruct the jurors on the element of causation.

{¶73} Thus, contrary to Berry's assertion, the record indicates that the trial court adequately explained the causation element for the offense of involuntary manslaughter in its instructions to the jury. The trial court's explanation of causation closely tracked with the language of the Ohio Jury Instructions for causation. OJI-CR 417.23, OJI-CR 417.25. *See State v. Reese*, 7th Dist. Mahoning No. 14 MA 116, 2016-Ohio-557, ¶ 18. Since Berry has not demonstrated how this instruction was defective, he cannot carry the burden of establishing plain error. As such, his first argument is without merit.

{¶74} Second, Berry argues that the trial court should have "included a 'but-for' causation instruction, or an instruction * * * regarding the 'substantial' or 'contributing' factor." Appellant's Brief, 12. Again, we note that Berry did not propose a specific jury instruction for causation, limiting our analysis to plain error. In his argument, Berry points to the United States Supreme Court's decision in *Burrage v. United States* as the basis for his argument that an instruction on "'but for' causation" is required in this context. Appellant's Brief, 13, citing *Burrage v. U.S.*, 571 U.S. 204, 218-219, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014). However, in *State v. Price*, the Ohio Supreme Court found that *Burrage* was "persuasive authority only." *State v. Price*, 2020-Ohio-4926, --- N.E.3d ---, ¶ 28. *See*

*Carpenter*, *supra*, at ¶ 49.  As such, his reliance on *Burrage* does not, by itself,

establish that the jury instructions were defective in the context of this case.

{¶75}  In *State v. Carpenter*, this Court also considered the use of the "but

for" test in the context of an involuntary manslaughter charge.  *Carpenter, supra*, at

¶ 52.  In that case, this Court stated that

> **[t]here are several tests for actual causation, the most common of which is the 'but for' test; however, there are circumstances under which the 'but for' test is inapplicable and an act or omission can be considered a cause in fact if it was a 'substantial' or 'contributing' factor in producing the result.**

(Citations omitted.)  *Id*.  Further, in *State v. Mitchell*, this Court held that

> **While 'but for' causation is used in the vast majority of cases, there are circumstances where that analysis is inapplicable because, as a matter of law, there can be more than one proximate cause of an injury.**

*State v. Mitchell*, 3d Dist. Union No. 14-19-14, 2019-Ohio-5168, ¶ 23.

{¶76}  In the case before this Court, the trial court did not mention the "but

for" test in its jury instructions.  Jan. 16 Vol. II Tr. 55-56.  Instead, the trial court

instructed the jury that, in this case, there could be more than one cause.  Jan. 16

Vol. II Tr. 55-56.  The trial court's decision was not, in this regard, improper under

*Mitchell*.  *Mitchell*, *supra*, at ¶ 23.  Thus, this second argument is without merit.  In

both of these arguments, Berry has not carried the burden of establishing that the

trial court committed an error let alone a plain error that affected the outcome of this

case.  As such, his third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶77}** Berry argues that the trial court erred by overruling his motion for a mistrial after a potential juror's statements allegedly tainted the jury pool.

Legal Standard

**{¶78}** "A mistrial is an extreme remedy, declared only when a fair trial is no longer possible." *State v. Sidibeh*, 192 Ohio App.3d 256, 2011-Ohio-712, 948 N.E.2d 995, ¶ 44 (10th Dist.). As such, "[m]istrials are necessary 'only when the ends of justice so require * * *.'" *State v. Welch*, 3d Dist. Wyandot No. 16-06-02, 2006-Ohio-6684, ¶ 9, quoting *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 131. "[A] mistrial should not be ordered merely because some error or irregularity had intervened." *State v. Carter*, 3d Dist. Allen No. 1-15-62, 2017-Ohio-1233, ¶ 71.

**{¶79}** "[T]he trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial." *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92. For this reason, the decision to grant or deny a motion for a mistrial lies within the sound discretion of the trial court. *State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 29 (3d Dist.). Thus, a trial court's disposition of a motion for a mistrial will not be disturbed in the absence of an abuse of discretion. *Id*. "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is

unreasonable, arbitrary or unconscionable." *State v. Ortega*, 3d Dist. Hancock No. 5-16-17, 2017-Ohio-239, ¶ 10, quoting *Adams, supra*, at 157.

Legal Analysis

**{¶80}** In this case, defense counsel made a motion for a mistrial after a potential juror made the following remarks during voir dire:

> **[Trial court]: I think—did the next lady have her hand up? * * *.**
>
> **Juror: Yeah. He dated my good friend in high school.**
>
> **[Trial court]: Mr. Berry?**
>
> **Juror: Uh-huh. I believe so. He's from Plain City.**
>
> **[Trial court]: Okay. So dated good friend?**
>
> **Juror: Yes.**
>
> **[Trial court]: And you think that that's going to keep you from being able to be fair and impartial in this case?**
>
> **Juror: Probably.**
>
> **[Trial court]: Why? I'll put you on the spot a little bit.**
>
> **Juror: Well, he never liked me then and he always scared me and he was the same kind of person back then.**
>
> **[Trial court]: Okay. All right. So the rest of the jurors need to disregard that last part, same kind of person back then.**
>
> **Juror: Sorry.**

Jan. 13 Vol. I Tr. 21-22. *See State v. Palmer*, 8th Dist. Cuyahoga No. 89957, 2008-Ohio-2937, ¶ 21.

**{¶81}** We begin our analysis of these comments by noting that this potential juror was subsequently dismissed and did not, therefore, participate in the jury deliberations. Jan. 13 Vol. I Tr. 48-51. *See State v. Richardson*, 5th Richland No. 18CA24, 2018-Ohio-4817, ¶ 22 (considering the fact that an alternate juror who had made inappropriate comments "did not participate in the deliberations."). Nonetheless, Berry asserts that "[t]he entire jury pool was tainted" by this comment. Appellant's Brief, 15. However, "[p]rejudice can not generally be presumed but must be affirmatively demonstrated in the record." *State v. Gonzales*, 3d Dist. Wyandot No. 16-08-17, 2009-Ohio-1656, ¶ 8. The nature of these comments is not "so egregious" that they overcome this general presumption. *State v. Hairston*, 4th Dist. Scioto No. 06CA3087, 2007-Ohio-4159, ¶ 15. Berry has also not raised an argument that demonstrates, from the record, how these remarks biased the jurors or prejudiced the proceedings. *Gonzales* at ¶ 8.

**{¶82}** Further, the trial court instructed the other jurors to disregard this potential juror's comments. Jan. 13 Vol. I Tr. 22. *See State v. Wayt*, 83 Ohio App.3d 848, 615 N.E.2d 1107, 1109 (12th Dist. 1992) (considering the trial court's corrective measures in response to a juror's challenged comments). The trial court later instructed the jurors as to what evidentiary materials they could consider in reaching a verdict. Jan. 16, Vol. II Tr. 50. *See State v. Williams*, 10th Dist. Franklin No. 94APA12-1786, 1995 WL 527672, * 3 (Sept. 7, 1995) (considering that a juror's challenged comments came before the jury had been instructed "on the law

to be applied in the case."). We are to presume that the jurors followed the instructions of the trial court. *State v. McWay*, 3d Dist. Allen No. 1-17-14, 2018-Ohio-3618, ¶ 12. Berry has not given us a reason to dispense with this presumption.

**{¶83}** In conclusion, the fact that a potential juror is dismissed during the course of voir dire does not, by itself, render the remaining jurors biased. Berry has not demonstrated from the record that these remarks tainted the jury or prejudiced the remainder of these proceedings. *See Gonzalez, supra*, at ¶ 8, 10. In other words, he has not established that a fair trial was no longer possible. Having reviewed the materials in the record, we cannot conclude that the trial court abused its discretion in denying Berry's motion for a mistrial. Thus, his fourth assignment of error is overruled.

*Fifth Assignment of Error*

**{¶84}** Berry argues that the trial court erred in denying the motion for a mistrial that he made after the State was late in disclosing the agreement between the police and the confidential informant.

Legal Standard

**{¶85}** We reincorporate the standard for mistrials set forth under the fourth assignment of error. Further, Crim.R. 16 reads, in its relevant part, as follows:

> **(A) Purpose, Scope and Reciprocity. This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties**

> **and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.**
>
> **(L) Regulation of Discovery.**
>
> **(1) The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.**

Crim.R. 16(A), (L)(1). "'[T]he philosophy of the Criminal Rules is to remove the element of gamesmanship from a trial.' The purpose of discovery rules is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial." *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138, 1140 (1987), quoting *State v. Howard*, 56 Ohio St.2d 328, 333, 383 N.E.2d 912, 915 (1978).

> **When considering whether a discovery violation occurred, courts must consider three factors: (1) whether the failure to disclose was willful; (2) whether foreknowledge of the undisclosed material would have benefitted the defendant in trial preparation; and (3) whether the accused was prejudiced by the late disclosure.**

*State v. Vargo*, 7th Dist. Belmont No. 17 BE 0021, 2018-Ohio-2487, ¶ 21, citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 35.

> **A trial court must inquire into the circumstances producing the alleged violation of Crim.R. 16. The court is required to impose the least severe sanction that is consistent with the purpose of the rules of discovery.**

*State v. Parker*, 53 Ohio St.3d 82, 86, 558 N.E.2d 1164, 1168 (1990).

Legal Analysis

{¶86} In this case, defense counsel informed the trial court that the State had not disclosed the defendant's agreement" between G.C., the confidential informant, and the Union County Prosecutor's Office. Jan. 13 Vol. I Tr. 114. Ex. 229. On the basis of this failure, the Defense objected "to any testimony or use of [G.C.] here at this trial * * *." Jan. 13 Vol. I Tr. 115.

{¶87} Before the trial began, the State explained that, under this agreement, G.C. had agreed to be a confidential informant in several controlled buys. Jan. 13 Vol. I Tr. 116. If G.C. complied with the terms of this agreement, he would not be charged with several crimes. Jan. 13 Vol. I Tr. 115-116. Jan. 13 Vol. II Tr. 10. Ex. 229. However, G.C. was caught lying to the police in violation of the defendant's agreement. Jan. 13 Vol. II Tr. 7, 9. As a result, the defendant's agreement was terminated. Jan. 13 Vol. II Tr. 12. G.C. did not receive the benefit held out under this defendant's agreement and was charged with a crime. Jan. 13 Vol. II Tr. 13.

{¶88} The State identified the fact that the defendant's agreement was violated and terminated as a reason that its late disclosure should not be a basis for a discovery sanction. Jan. 13 Vol. I Tr. 116. Before trial, the State also produced a

copy of the defendant's agreement for the Defense to review. Jan. 13 Vol. I Tr. 117, 119. In response, defense counsel stated that he "suspected there was a deal, but did not know there was a deal." Jan. 13 Vol. I Tr. 118. He then asserted that this late disclosure "could very well have materially, if not drastically[,] altered trial strategy in terms of how we approach [G.C.]." Jan. 13 Vol. I Tr. 118. The Defense then requested a continuance of the trial. Jan. 13 Vol. I Tr. 118.

{¶89} After hearing these arguments, the trial court denied this request for a continuance and stated the following:

> **The issue is prejudice. This case has been pending before this Court * * * since February of 2019. Almost an entire year. And if you wish to have inspected the documents related to the prior record, you could have done that. If you had any questions about whether or not the State was fully compliant with their obligations under Criminal Rule 16, you could have raised that with the Court prior to now.**
>
> **\* \* \***
>
> **Objection's overruled subject to the Court's order that the State provide the agreement, which turned out not to be an agreement, and record, which you've done both of these. And the Court's order that the defense is entitled to voir dire the witness prior to testimony if they wish to do that.**

Jan. 13 Vol. I Tr. 119-120. The trial court gave the Defense one hour to review the relevant materials before trial. Jan. 13 Vol. I Tr. 119-120. The trial court concluded this discussion by stating that "if there's any issues about not enough time, we can deal with it at that point in time." Jan. 13 Vol. I Tr. 120-121.

{¶90} Before the trial resumed, the Defense declined to question G.C. before the State called him as a witness. Jan. 13 Vol. I Tr. 121-122. Deputy Wilson was the State's first witness. Jan. 13 Vol. I Tr. 122. The State and the Defense questioned him about the contents of the defendant's agreement and the actions G.C. committed in violation of that agreement. Jan. 13 Vol. II Tr. 7-13; Jan. 14 Vol. I Tr. 89-90, 119-125. Subsequently, when G.C. was called by the State as a witness, he refused to testify. Jan. 14 Vol. I Tr. 126. After G.C. refused to answer the State's questions on direct examination, the trial court gave the Defense the opportunity to cross-examine G.C. Jan. 14 Vol. I Tr. 160. However, at this point, the Defense declined to cross-examine him. Jan. 14 Vol. I Tr. 160.

{¶91} On appeal, Berry has not demonstrated how he was prejudiced by the late disclosure of a copy of the defendant's agreement. The trial court gave the Defense an opportunity to review the relevant materials. Jan. 13 Vol. I Tr. 120-121. The Defense ably and extensively cross-examined Deputy Wilson about the contents of this defendant's agreement and G.C.'s violations of this agreement after the State had extensively questioned Deputy Wilson about the same matters. Jan. 13 Vol. II Tr. 7-13; Jan. 14 Vol. I Tr. 19-26, 89-90. Thus, the jury heard about the terms of the defendant's agreement and G.C.'s dishonesty without hearing G.C.'s testimony about the four controlled buys in which he was a confidential informant. Jan. 14 Vol. II Tr. 126-160.

**{¶92}** Further, in its arguments about the late disclosure of the defendant's agreement before trial, the Defense asserted that its strategy with regard to G.C. might be affected by the State's late disclosure of the defendant's agreement. Jan. 13 Vol. I Tr. 118. However, because of G.C.'s refusal to testify, the Defense declined even to cross-examine G.C. Jan. 14 Vol. I Tr. 160. For these reasons, Berry has not demonstrated how his Defense was, in fact, prejudiced by the late disclosure of G.C.'s defendant's agreement.

**{¶93}** Since Berry has not demonstrated prejudice under the facts of this case, his argument is without merit. *See Smale, supra*, at ¶ 38. Having reviewed the materials in the record, we cannot conclude that the trial court abused its discretion in deciding not to declare a mistrial. As such, Berry's fifth assignment of error is overruled.

*Sixth Assignment of Error*

**{¶94}** Berry asserts that the trial court should not have held G.C. in contempt of court for his refusal to testify and should have given an instruction to the jurors to disregard the testimony that G.C. did give before he refused to testify.

Legal Standard

**{¶95}** If a party alleges that the trial court failed to instruct the jury to disregard a witness's testimony but did not request such an instruction, all but plain error is waived on appeal. *State v. Dickinson*, 3d Dist. Paulding No. 11-08-08, 2009-Ohio-2099, ¶ 27. *See also State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892

N.E.2d 864, ¶ 171 (holding that the failure to request curative instructions "waiv[es] any claim to such instructions"). Accordingly, we reincorporate the standard for plain error as set forth under the third assignment of error above.

Legal Analysis

**{¶96}** In this case, G.C. was called as a witness by the State. Jan. 14 Vol. I Tr. 114. However, once on the stand, G.C. asserted his Fifth Amendment right against self-incrimination and refused to testify. Jan. 14 Vol. I Tr. 126, 134. The trial court ordered a recess to allow G.C. time to consult with his attorney. Jan. 14 Vol. I Tr. 134. The State offered G.C.

> **immunity as it relates to, one, any questions asked by the prosecutor this afternoon; and, two, specifically as it relates to any events that occurred on April the 7th of 2017, April the 27th of 2017, June the 16th of 2017, and June the 21st of 2017.**

Jan. 14 Vol. I Tr. 134. Based on this grant of immunity, the trial court determined that G.C. did "not have a Fifth Amendment Right against self-incrimination." Jan. 14 Vol. I Tr. 135. However, G.C. continued to refuse to testify. Jan. 14 Vol. I Tr. 150-161. In response, the trial court held G.C. in contempt. Jan. 14 Vol. I Tr. 150-161. After the State concluded direct examination, the Defense declined to cross-examine G.C. Jan. 14 Vol. I Tr. 160.

**{¶97}** The Defense did not object or raise an argument before the trial court as to whether G.C. should be held in contempt for his refusal to testify.[4] As such,

---

[4] Before the State formally granted G.C. immunity, defense counsel argued that G.C. could refuse to testify pursuant to his Fifth Amendment right against self-incrimination. Jan. 14 Vol. I Tr. 133. The trial court

we will apply the standard of plain error for review. On appeal, Berry has not advanced an argument that explains how the trial court's decision to hold G.C. in contempt was an error, let alone an error that prejudiced his substantial rights and changed the outcome of this proceeding. *Taflinger, supra*, at ¶ 17. In the absence of such a showing, this argument is without merit.

{**¶98**} Further, the Defense also did not request an instruction from the trial court that directed the jurors to disregard the small amount of testimony that G.C. did give before his refusal to testify. In the absence of such a request, we will apply the standard for plain error on appeal. Again, Berry has not advanced an argument that explains how the trial court erred by failing to instruct the jury to disregard the limited testimony that G.C. gave before he refused to testify. Even if the trial court should have given such an instruction, Berry has not demonstrated how the absence of this instruction prejudiced his substantial rights and changed the outcome of this proceeding. Since Berry has not carried the burden of demonstrating plain error in either of these two arguments, his sixth assignment of error is overruled.

*Seventh Assignment of Error*

---

stated that it agreed with this argument based on how the situation stood at that moment. Jan. 14 Vol. I Tr. 133. Further, the State initially requested that G.C. be called as a court's witness. Jan. 14 Vol. I Tr. 127. Defense counsel opposed this request. Jan. 14 Vol. I Tr. 127, 149. However, after G.C. consulted with his attorney and after the State formally granted G.C. immunity, defense counsel did not object or raise arguments against the trial court's findings of contempt against G.C. Jan. 14 Vol. I Tr. 150-161.

**{¶99}** Berry argues the text messages between him and Ashley that were admitted into evidence were inadmissible evidence that violated his right to confront the witnesses against him.

Legal Standard

**{¶100}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is typically inadmissible unless the statement falls into a hearsay exception. Evid.R. 802. "An appellate court's review of the admission of evidence is limited to a determination as to whether the trial court abused its discretion." *State v. Hawkey*, 2016-Ohio-1292, 62 N.E.3d 721, ¶ 63 (3d Dist.), quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). "An abuse of discretion has been described as an unreasonable, arbitrary or unconscionable decision." *State v. Harris*, 3d Dist. Hancock No. 5-99-14, 1999 WL 797159 (Sept. 30, 1999).

**{¶101}** "Evidence * * * admissible at trial as a hearsay exception * * * may nonetheless be inadmissible because it violates a defendant's right of confrontation." *State v. Dever*, 64 Ohio St.3d 401, 415, 596 N.E.2d 436 (1992). "The question of whether a criminal defendant's rights under the Confrontation Clause have been violated is reviewed under a de novo standard." *State v. Douglas*, 3d Dist. Marion No. 9-05-24, 2005-Ohio-6304, ¶ 39, citing *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004).

> **The Confrontation Clause guarantees the right of defendants in criminal cases 'to be confronted with the witnesses against him.'** ***Crawford* [*v. Washington*, 541 U.S. 36,] 38, 124 S.Ct. 1354 [158 L.Ed.2d 177 (2004)].** **Since a witness is a person who 'bear[s] testimony,'** ***Id*. at 51, 124 S.Ct. 1354, quoting 2 N. Webster, An American Dictionary of the English Language (1828), 'the Confrontation Clause applies only to testimonial statements.'** ***State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59, citing** ***State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 15.** **For testimonial hearsay to be admitted, the witness must be 'unavailable to testify, and the defendant [must have] had a prior opportunity for cross-examination.'** ***Crawford* at 54, 124 S.Ct. 1354.** **With nontestimonial hearsay, however, 'the States [have] flexibility in the development of hearsay law.'** ***Id*. at 68, 124 S.Ct. 1354.**

*State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323 (3d Dist.). However,

> **[t]here is * * * no dispute that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'** ***Crawford* at 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9. * * *.**

(Citations omitted.) *State v. Ricks*, 136 Ohio St.3d 356, 2013-Ohio-3712, 995 N.E.2d 1181, ¶ 18. *See State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 131 (finding that "the Confrontation Clause did not apply" to statements that "were not offered to establish the truth of the matter asserted.").

Legal Analysis

{¶102} At trial, the State sought to admit a series of text messages that had been exchanged between Ashley and Berry in the twenty-four hours preceding her death. Jan. 16 Vol. I Tr. 70. *See* Doc. 182. Berry challenged the text messages that Ashley had sent to Berry. Jan. 16 Vol. I Tr. 72. The trial court admitted these text

messages because Berry's statements were admissions by a party opponent and because Ashley's statements were not offered for the truth of the matters asserted. Jan. 16 Vol. I Tr. 71-73.

{¶103} Under Evid.R. 802(D)(2)(a), "a statement is not hearsay if * * * [t]he statement is offered against a party and is * * * the party's own statement * * *." Evid.R. 802(D)(2)(a). "[M]ultiple courts have held that text messages sent by a defendant are not hearsay pursuant to Evid.R. 801(D)(2)." *State v. Norris*, 2016-Ohio-5729, 76 N.E.3d 405, ¶ 32 (2d Dist.), citing *State v. Miller*, 1st Dist. Hamilton No. C-130774, 2015-Ohio-330, ¶ 17; *State v. Shaw*, 2013-Ohio-5292, 4 N.E.3d 406, ¶ 43 (7th Dist.); *State v. Bickerstaff*, 11th Dist. Ashtabula No. 2014-A-0054, 2015-Ohio-4014, ¶ 15; *State v. Davis*, 2016-Ohio-1166, 61 N.E.3d 650 (12th Dist.). Thus, the text messages sent by Berry are statements made by a party opponent under Evid.R. 802(D)(2)(a) and are not, therefore, hearsay. *See State v. Irwin*, 2d Dist. Montgomery No. 26224, 2015-Ohio-195, ¶ 19; *State v. Stapleton*, 4th Dist. Pickaway No. 19CA7, 2020-Ohio-4479, ¶ 24.

{¶104} Further, "[i]f a statement is not offered for the truth of the matter asserted * * *, it is not prohibited by the hearsay rule * * *." *State v. LeMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 59. "Accordingly, 'testimony which explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities, is not hearsay.'" *Id*., quoting *State v. Maurer*, 15 Ohio St.3d 239, 262-263, 473 N.E.2d 768, 790 (1984). *See State v. Osie*, 140 Ohio

St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 122 (holding that "[a] statement is not hearsay when introduced to show its effect on the listener."). "Multiple courts have held that text messages received on a defendant's cell phone are not hearsay when the messages are not offered for the truth of the matter asserted." *Norris* at ¶ 32, citing *Miller* at ¶ 17; *State v. Crocker*, 2015-Ohio-2528, 38 N.E.3d 369 (4th Dist.).

{¶105} In *State v. Fitts*, the Sixth District considered a situation that is factually similar to the case before this Court. *State v. Fitts*, 6th Dist. Wood Nos. WD-18-092, WD-18-093, 2020-Ohio-1154, ¶ 32. In *Fitts*, M.T., as a confidential informant, arranged several controlled buys with the defendant over text messages. *Id*. at ¶ 3. The Sixth District determined that the texts from Fitts to M.T. were not hearsay as these statements were "admissions by a party-opponent * * * under Evid.R. 801(D)(2)(a)." *Id*. at ¶ 32. However, the messages sent by M.T. to Fitts fell into three different categories:

> **(1) 'small talk' initiated for the purpose of reestablishing the relationship between M.T. and Fitts; (2) questions posed to Fitts relating to various aspects of the drug transactions; and (3) details relating to the transactions such as quantity, price, and location of the exchanges.**

*Id*. at ¶ 32. The Sixth District considered each of these categories of text messages in *Fitts* under the Confrontation Clause. *Id*. at ¶ 32-34.

{¶106} First, the Sixth District found that the "small talk" messages between M.T. and Fitts "were not offered for the truth of the matter asserted, thus the

confrontation clause was not implicated." *Fitts* at ¶ 33.  Second, M.T.'s "questions [were] not statements.'"  *Id*. at ¶ 34.

> **The Sixth Circuit Court of Appeals, applying the analogous federal rule, explained that 'a question is typically not hearsay because it does not assert the truth or falsity of a fact.  A question merely seeks answers and usually has no factual content.'** *United States v. Wright***, 343 F.3d 849, 865 (6th Cir. 2003), citing** *Quartararo v. Hanslmaier***, 186 F.3d 91, 98 (2d Cir. 1999).**

*Id*.  For this reason, these questions did not implicate the Confrontation Clause.  *Id*. Third, the messages "relating to the details of the purchases" "were offered to show the effect on Fitts, to explain the events, and to provide context—they were not offered to prove the truth of the matters asserted" and did not run afoul of the Confrontation Clause.  *Id*. at ¶ 35, 37.  Thus, the Sixth District concluded that the text messages from M.T. to Fitts were admissible and did not run afoul of the Confrontation Clause.  *Id*. at ¶ 37-38.

{¶107} Turning to the facts of this case, the text messages from Ashley to Berry fall within the same categories set forth in *Fitts*.  First, Ashley and Berry began this text exchange with small talk: "Been patient holding…" Ex. 173. Ashley discussed her sleep problems: "You have a continuous flow of energy…I do not." Ex 181.  She also bantered with Berry: "Should've invited me. . . just sayin", and "I was going easy on you…figured youve been through enough tonight[.]"  Ex. 175, 177, 181, 183, 184, 185.  Following *Fitts*, these text messages do not constitute hearsay as these statements were not offered for the truth of the matters asserted.

*Fitts, supra*, at ¶ 33. These text messages also do not run afoul of the Confrontation Clause. *Id.*

{¶108} Second, Ashley asked Berry a number of questions in the texts that were admitted at trial: "Did you make it to dinner?", "So how can I get that from you?", "So is that a no go for tonight?", "[W]ill you accept IOU's?", and "Where will you be?" Ex. 173, 177, 179, 182, 183, 193, 194. We note that a number of these questions requested information from Berry regarding the alleged drug transaction. *Fitts, supra*, at ¶ 34. These questions provide the context for Berry's statements and do not, in this case, "assert the truth or falsity of a fact." *Id.*, quoting *Wright, supra*, at 865. Following *Fitts*, we conclude that these questions were not statements that constituted hearsay or implicated the Confrontation Clause. *Fitts, supra*, at ¶ 34.

{¶109} Third, a number of Ashley's texts addressed "the details of the purchases." *Fitts, supra*, at ¶ 35. Ex. 179, 193, 194, 195, 196. Berry and Ashley exchanged several texts to determine where the other person was so that they could meet. Ex. 193, 194, 195, 196. These messages were not introduced to prove the truth of the matters asserted but to provide context for the statements that Berry sent to Ashley. *See* Doc. 182. Following *Fitts*, these text messages from Ashley to Berry do not constitute inadmissible hearsay statements or run afoul of the Confrontation Clause. *Fitts, supra*, at ¶ 36-17, citing *Crocker, supra*, at ¶ 49-51. For these reasons,

we find the Berry's arguments against the admission of Ashley's texts to be without merit.

{¶110} On appeal, Berry also argues that the State relied on the truth of the matters asserted by Ashley in her text messages in its closing arguments. However, the trial court gave the jurors the following instruction at the time that the text messages between Ashley and Berry were admitted:

> **As it relates to the texts of the decedent Ashley Russell, you can only—those texts are not offered to prove anything. They're simply—you can only consider them to prove the context, to give meaning to, in other words, things that the defendant was saying.**
>
> **So, you can consider them for that reason. You cannot consider them for any other reason.**

Jan. 16. Vol. I Tr. 73. Further, during the jury instructions, the trial court also instructed the jurors that the contents of the opening and closing arguments of the parties were not evidence. Jan. 16 Vol. II Tr. 50. "It is presumed that the jury followed the trial court's instructions." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 292. Since Berry has not directed us to any evidence in the record that would cause us to dispense with this presumption, we find this argument to be without merit.

{¶111} Having examined the materials in the record, we conclude that the challenged texts do not constitute inadmissible hearsay and do not run afoul of the Confrontation Clause. Thus, we do not find any error in the trial court's decision to

admit the text messages that had been exchanged between Ashley and Berry.  As such, Berry's seventh assignment of error is overruled.

*Eighth Assignment of Error*

{¶112} In this case, both of Ashley's parents, Tonya and Rich Russell ("Rich"), testified as witnesses and were physically present in court during the testimony of the other witnesses.  Berry asserts that the trial court failed to separate witnesses in this regard.

Legal Standard

{¶113} "Evid.R. 615 governs the separation and exclusion of witnesses * * *." *State v. Schlosser*, 3d Dist. Union No. 14-10-30, 2011-Ohio-4183, ¶ 14.  This provision reads, in its relevant part, as follows:

> **(A)  Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.  * * *.**
>
> **(B)  This rule does not authorize exclusion of any of the following persons from the hearing:**
>
> **\* \* \***
>
> **(4)  in a criminal proceeding, an alleged victim of the charged offense to the extent that the alleged victim's presence is authorized by statute enacted by the General Assembly or by the Ohio Constitution.  As used in this rule, 'victim' has the same meaning as in the provisions of the Ohio Constitution providing rights for victims of crimes.[5]**

---

[5] Evid.R. 615 was amended in order "to comply with the 2017 amendment to Article I, Section 10a of the Ohio Constitution, also known as Marsy's Law."  2019 Staff Note, Evid.R. 615.

Evid.R. 615(A), (B)(4). "The purpose of separating witnesses is to prevent them from hearing the testimony of other witnesses and tailoring their testimony accordingly." *State v. Lawler*, 6th Dist. Lucas No. L-03-1025, 2005-Ohio-134, ¶ 24.

{¶114} Matters regarding the "separation of witnesses '[are] ordinarily * * * within the sound discretion of the trial court.'" *State v. Williams*, 2018-Ohio-974, 108 N.E.3d 758, ¶ 29 (10th Dist.), quoting *State v. Smith*, 49 Ohio St.3d 137, 142, 551 N.E.2d 190, 195 (1990). "Whether or not the trial court has properly exercised his discretion as to a separation of witnesses must be determined in the light of the facts and circumstances of each case." *State v. Williams*, 3d Dist. Marion No. 9-80-29, 1981 WL 6806, *2 (Mar. 11, 1981), quoting *State v. Slone*, 40 Ohio App.2d 523, 320 N.E.2d 720 (10th Dist. 1974), quoting 53 American Jurisprudence 46, Trial, Section 31. On appeal, "[i]t is incumbent upon the appellant to affirmatively demonstrate prejudice * * *." *Id*. *See also State v. Hohvart*, 7th Dist. Mahoning No. 06 MA 43, 2007-Ohio-5349, ¶ 31.

{¶115} If a party fails to object to issues regarding the separation of witnesses before the trial court, all but plain error is waived on appeal. *Schlosser*, *supra*, at ¶ 12-15. We reincorporate the standard for plain error set forth under the third assignment of error above.

Legal Analysis

**{¶116}** On appeal, Berry argues that Rich and Tonya should have been subject to a separation order since both were called by the State as witnesses.[6] However, defense counsel did not raise the issue of the separation of witnesses to the trial court before Tonya or Rich were called as witnesses. For this reason, we will review these arguments for plain error only.

**{¶117}** In his brief, Berry does not explain how the outcome of his trial would have been different if Rich and Tonya had been separated as witnesses. Rich and Tonya's testimony largely provided background information about Ashley's addiction and her relationship with Berry over the past several years. Jan. 14 Vol. II Tr. 24-100. Jan. 15 Vol. II Tr. 364-371. While Rich and Tonya provided testimony that was relevant to this case, they did not generally provide testimony that tended to establish the essential elements of the charges against Berry.

**{¶118}** Having reviewed the materials in the record, we cannot conclude that the outcome of this proceeding would have been different if Rich and Tonya had been subject to a separation of witnesses order. Thus, Berry has not carried the burden of establishing plain error in this argument. For this reason, his eighth assignment of error is overruled.

---

[6] On June 8, 2020, the prosecution filed a notice ("notice") with the trial court that addressed the issue of the separation of witnesses. Doc. 176. The prosecution asserted that Ashley's family members had a constitutional right under Marsy's Law to be present for the entirety of the trial and could not be excluded. Doc. 176. The Defense did not file a motion in response to this notice or raise an objection to the claims made therein. *See* Appellant's Brief, 23. Further, the trial court did not make a ruling related to the assertions contained in the State's notice that is challenged in this appeal. While the State relies on the arguments contained in its pretrial notice in this appeal, we need not resort to an analysis that relies on Marsy's Law to resolve the specific arguments raised by Berry in this assignment of error.

*Ninth Assignment of Error*

**{¶119}** Berry argues that several of his trial counsel's decisions constitute ineffective assistance of counsel.

Legal Standard

**{¶120}** "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Harvey,* 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *McWay*, *supra*, at ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶121}** In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 35, quoting *Strickland* at 687. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 14,

quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

{¶122} In order to establish prejudice, "the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Davis, supra*, at ¶ 36, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

Legal Analysis

{¶123} *Failure to Request a Jury Instruction on Causation*: Berry first argues that his trial counsel was ineffective for failing to request a general jury instruction on the element of causation after the trial court failed to include one. However, under this third assignment of error, we concluded that the trial court did, in fact, give the jury an instruction on causation. Accordingly, his trial counsel did not need to make a request for an explanation of causation to be included in the jury instructions. The failure to make an unnecessary request does not constitute deficient performance. Thus, this argument is without merit.

{¶124} *Failure to Request a* Burrage *Jury Instruction*: Berry next asserts that his defense counsel failed to request a specific jury instruction based upon the United States Supreme Court's decision in *Burrage v. U.S. See Burrage, supra*.

Generally, trial "counsel's decision not to request a jury instruction falls within the ambit of trial strategy." *Conway*, *supra*, at ¶ 111. We note that *Burrage* is only persuasive authority for Ohio courts. *See Price, supra,* at ¶ 28. Further, in his brief, Berry does not assert a single argument to establish that he was prejudiced by his trial counsel's failure to make this request for a specific jury instruction. Accordingly, he has not carried the burden of establishing an ineffective assistance of counsel claim with this argument.

{¶125} *Failure to Cross-Examine the Confidential Informant*: Berry argues that his trial counsel was ineffective for failing to cross-examine G.C. However, the decision whether to cross-examine a witness is a matter of trial strategy that "is firmly committed to the trial counsel's judgment * * *." *State v. Grate*, 2020-Ohio-5584, --- N.E.3d ---, ¶ 148 (holding that defense counsel is not required to conduct a cross-examination of every witness), quoting *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996). At trial, G.C. adamantly refused to testify on direct examination and was held in contempt. Jan. 14 Vol. I Tr. 152. There is no indication that G.C. would have answered questions on cross-examination. Further, Berry has not demonstrated how the outcome of his trial would have been different if defense counsel had cross-examined G.C. Thus, he has failed to establish an ineffective assistance of counsel claim with this argument.

{¶126} *Failure to Call an Expert Witness*: Berry argues that defense counsel should have called an expert witness to rebut the findings of the State's expert

witnesses. In general, the decision of whether to call an expert witness is a matter of trial strategy. *State v. Cook*, 3d Dist. Union No. 14-19-26, 2020-Ohio-3411, ¶ 106. In this case, defense counsel vigorously cross-examined the State's expert witnesses. Jan. 15 Vol. I Tr. 78-97, 107-110, 125-131, 174-184. Jan. 15 Vol. II Tr. 246-257, 261. Based on the record, defense "counsel's decision to rely on cross-examination appears to have been a legitimate 'tactical decision' * * *." *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97. *See State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150, 1177 (2001). Further, Berry has not demonstrated how calling an expert witness would have changed the outcome of this case.

{¶127} *Failure to Investigate Lisa Crumb*: Berry argues that defense counsel failed to investigate Crumb fully even though she was the last person to see Ashely alive. As a general matter, trial "counsel has a duty to make reasonable investigations * * *." *State v. Bradley*, 42 Ohio St.3d 136, 146, 538 N.E.2d 373, 383 (1989). Berry has alleged but has not established that defense counsel failed to investigate Crumb. The record indicates that defense counsel came fully prepared to cross-examine Crumb at trial. Jan. 15 Tr. 308-316. Further, Berry has not advanced any argument in his brief that would demonstrate how the outcome of this proceeding would have been different if defense counsel had further investigated Crumb. Thus, this argument does not establish an ineffective assistance of counsel claim.

**{¶128}** *Failure to Conduct Independent Testing*: Berry asserts that defense counsel was ineffective for failing to conduct independent tests of the evidence. As with seeking the analysis of an independent expert witness, the decision to seek independent testing is generally a matter of trial strategy. *State v. Richardson*, 5th Dist. Richland No. 2009-CA-00027, 2009-Ohio-4867, ¶ 72. *See Foust* at ¶ 97; *State v. Norman*, 4th Dist. Ross Nos. 08CA3059, 08CA3066, 2009-Ohio-5458, ¶ 67. In this case, trial counsel cross-examined the analyst who tested the powdery substance found in Ashley's house. Jan. 15 Vol. I Tr. 80-91. Further, Berry has not advanced a single argument on appeal that explains how he was prejudiced by this decision. Thus, this argument does not establish an ineffective assistance of counsel claim.

**{¶129}** *Failure to Respond to the State's Motions, Briefs, or Notices*: Berry argues that defense counsel failed to file a brief on the admissibility of Ashley's text messages with Berry; a response to a Marsy's Law Notice that indicated that the family would be present for the trial; a response to an order to compel G.C. to testify; or a sentencing recommendation.

**{¶130}** While defense counsel did not file a brief on the admissibility of the text messages between Ashley and Berry, he did argue against their admission at trial. Jan. 13 Vol. II Tr. 43. Jan. 14 Vol. II Tr. 76. Jan. 16 Vol. I Tr. 183-184. The trial court ruled that these messages were admissible over these objections. Further, under the seventh assignment of error, we concluded that the trial court did not err

in allowing the jury to consider these text messages. Thus, Berry cannot demonstrate how filing a brief would have changed the outcome of this case.

{¶131} The record indicates that defense counsel did not file a motion in response to the State's notice that the family members would be present for trial pursuant to Marsy's Law. However, Rich and Tonya primarily provided testimony regarding their relationship with Ashley, her prior history of substance abuse, and her relationship with Berry over the past few years. They also generally testified about different matters. Berry has not, on appeal, demonstrated how filing a response to the State's notice would have changed the outcome of this proceeding.

{¶132} Berry also argues that his trial counsel was deficient for failing to raise an argument against the trial court's efforts to compel G.C. to testify. However, he cannot demonstrate how arguing against the trial court's efforts to compel G.C. to testify would have changed the outcome of his trial because G.C. still refused to testify even after the trial court warned him that he could be held in contempt.

{¶133} Finally, while defense counsel did not file a formal sentencing recommendation, he did present evidence as to the relevant sentencing factors at Berry's sentencing hearing. Further, Berry has not advanced any argument as to how the outcome of these proceedings would have been different if defense counsel had filed a formal sentencing recommendation. *State v. Hawkins*, 2d Dist. Greene No. 98CA6, 1999 WL 197932, *2 (April 9, 1999).

{¶134} *Failure to Seek a Determination of Admissibility for Several of Ashley's Texts*:  Berry contends that defense counsel was ineffective for failing to seek a preliminary determination from the trial court as to whether Ashley's texts to her friend, Chris Smith ("Smith"), were admissible.  However,

> **[a] motion in limine is a precautionary ruling in anticipation of an evidentiary issue and is not final.  *State v. Grubb*, 28 Ohio St.3d 199, 201, 503 N.E.2d 142 (1986).  'It is counsel's duty to make his own appraisal of the case and to decide when such motions are worth filing.'**

*State v. Mayse*, 2017-Ohio-1483, 88 N.E.3d 1208, ¶ 30 (3d Dist.), quoting *State v. Giddens*, 3d Dist. Allen No. 1-02-52, 2002-Ohio-6148, ¶ 30.  We note that defense counsel, at trial, cross-examined Corporal Stone at length about Ashley's text messages, including those exchanged with Smith.  Jan. 16 Tr. 157-169.  Further, Berry has not explained how the outcome of his trial would have been different had defense counsel sought a preliminary ruling on these text messages.

{¶135} In each of these arguments, Berry has failed to carry the burden of establishing an ineffective assistance of counsel claim.  For this reason, his ninth assignment of error is overruled.

*Tenth Assignment of Error*

{¶136} Berry argues that the trial court erred by imposing the maximum prison term on him for this crime.

Legal Standard

**{¶137}** In rendering a sentence, "[t]he trial court has full discretion to impose any sentence within the authorized statutory range * * *." *State v. Dayton*, 3d Dist. Union No. 14-16-05, 2016-Ohio-7178, ¶ 15, quoting *State v. King*, 2d Dist. Clark Nos. 2012-CA-25, 2012-CA-26, 2013-Ohio-2021, ¶ 45. However, in this process, trial courts are to sentence convicted felons in accordance with the overriding purposes of felony sentencing, which

> **are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.**

R.C. 2929.11. "To effectuate compliance with these overriding purposes, the Ohio Revised Code requires the trial court to consider a number of factors listed in R.C. 2929.12." *State v. Walton*, 3d Dist. Logan No. 8-17-55, 2018-Ohio-1680, ¶ 6. The R.C. 2929.12 factors direct the trial court to evaluate the seriousness of the offense and the likelihood of recidivism. R.C. 2929.12.

**{¶138}** "Appellate courts defer to the broad discretion of the trial court in matters of sentencing." *State v. Jones*, 3d Dist. Shelby No. 17-19-08, 2019-Ohio-4938, ¶ 7. If the defendant establishes by clear and convincing evidence that his or her sentence is "(1) contrary to law and/or (2) unsupported by the record," an appellate court has the authority, pursuant to R.C. 2953.08(G)(2), "to increase,

-67-

reduce, or otherwise modify a sentence * * *." *State v. McGowan*, 147 Ohio St.3d 166, 2016-Ohio-2971, 62 N.E.3d 178, ¶ 1.

{¶139} Thus, "[u]nder R.C. 2953.08(G)(2), an appellate court will reverse a sentence 'only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Nienberg*, 3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 8, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

> **Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.**

*Taflinger*, *supra*, ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, 53 O.O. 361, paragraph three of the syllabus (1954). However,

> **in *State v. Jones*, --- Ohio St.3d ---, 2020-Ohio-6729, the Supreme Court of Ohio clarified the proper scope of review of felony sentences imposed in cases * * * where the defendant's appeal challenged the trial court's application of R.C. 2929.11 and 2929.12. In *Jones*, the court held that R.C. 2953.08(G)(2)(b) 'does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12.' *Id*. at ¶ 39. * * * Accordingly, "pursuant to *Jones*, an appellate court errs if it * * * modifies or vacates a sentence 'based on the lack of support in the record for the trial court's findings under R.C. 2929.11 and R.C. 2929.12.'" [*State v*.] *Dorsey*, [2d Dist. Montgomery No. 28747,] 2021-Ohio-76, at ¶ 17, quoting *Jones* at ¶ 29.**

*State v. Slife*, 3d Dist. Auglaize No. 2-20-17, 2021-Ohio-644, ¶ 13.

Legal Analysis

{¶140} After considering the contents of a presentence investigation ("PSI") and several victim impact statements, the trial court expressly considered the overriding purposes of felony sentencing at the hearing. R.C. 2929.11(A). March 6 Tr. 38. The trial court found that "the shortest prison term would demean the seriousness of the offense and would not protect the public." March 6 Tr. 38. In particular, the trial court determined that his criminal history indicated that a longer sentence would be necessary to protect the public. March 6 Tr. 38. Further, the trial court also found that Berry's lack of remorse would impede his rehabilitation. March 6 Tr. 34.

{¶141} As to the seriousness factors, the trial court noted that the victim of the offense, Ashley, suffered serious physical harm as the result of this offense. March 6 Tr. 34. *See* R.C. 2929.12(B)(2). The trial court also found that Berry's relationship with the victim facilitated the offense of involuntary manslaughter as Berry referred to Ashley as his "friend" and "lover" at his sentencing hearing. March 6 Tr. 26, 34-35, 36. *See* R.C. 2929.12(B)(6). However, Defense counsel argued that "[t]he victim induced or facilitated the offense" as she requested strong narcotics from Berry. R.C. 2929.12(C)(1). March 6 Tr. 19. He also stated that Berry did not "expect[] to cause physical harm" to Ashley. March 6 Tr. 19-20. *See* R.C. 2929.12(C)(3).

{¶142} As to the recidivism factors, the trial court noted Berry had two prior convictions for trafficking in drugs. March 6 Tr. 4. PSI. Berry also had convictions for possession of marijuana, possession of drug paraphernalia, and for operating a vehicle under the influence. March 6 Tr. 34. PSI. *See* R.C. 2929.12(D)(2). The trial court also noted that the offenses for which he was being sentenced were the offenses that began his criminal history twenty-five years earlier. March 6 Tr. 36. PSI. *See* R.C. 2929.12(D)(3). The trial court determined that Berry did not respond favorably to these prior sanctions. Doc. 206.

{¶143} At the sentencing hearing, the State played a recording of a call that Berry had made from jail. March 6 Tr. 6. The following exchange took place in this call:

> **[Berry]: The rat b\*\*\*\*\*d system that we have in America has failed again. The rat b\*\*\*\*\*d. Again. So this is what the rest of my life looks like.**
>
> **[Unidentified]: Okay.**
>
> **[Berry]: Where's Ashley Russell's accountability in all this? Some little rich girl kills herself on dope and I'm the one that has to go pay for the body. Where's her accountability?**
>
> **[Unidentified]: (Inaudible).**
>
> **[Berry]: Yeah. Where's her accountability in all of this?**
>
> **[Unidentified]: I'll tell you where it's at. It's up Lieutenant Detective Stone's a\*\*hole right where her face is.**

**[Berry]: They got me so (inaudible) in this thing, bro, and that's it. You know what I'm saying? And that's it. They're just going to throw my life away cause they can. This wasn't a fair trial.**

March 6 Tr. 6-7. The trial court also found that Berry did not demonstrate any remorse or take responsibility for his actions. *See* R.C. 2929.12(D)(5).

{¶144} Defense counsel argued that Berry did care for Ashley and was remorseful over "her loss." March 6 Tr. 21. Further, Berry produced a statement in which he said he would "trade [him]self for Ashley" if he could. March 6 Tr. 5. *See* R.C. 2929.12(E)(5). Berry also admitted that he had a long history of addiction but stated that he had been sober for the five months previous to his sentencing hearing. March Tr. 26, 27. PSI. *See* R.C. 2929.12(D)(4). The trial court also took into account the fact that Berry had an Ohio Risk Assessment System score of eighteen, which signified "a moderate risk of re-offending." March 6 Tr. 37.

{¶145} After reviewing the evidence in the record, it is clear that the trial court considered the relevant factors in R.C. 2929.11 and R.C. 2929.12 in the process of sentencing Berry. Under *Jones*, "R.C. 2953.08(G)(2)(b) therefore does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12." *Jones, supra*, at ¶ 39. Accordingly, Berry has not carried requisite burden on appeal. Thus, Berry's tenth assignment of error is overruled.

*Conclusion*

**{¶146}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Union County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**SHAW and ZIMMERMAN, J.J., concur.**

**/hls**